## NATIONAL LABOR RELATIONS BOARD v. REED & PRINCE MFG. CO.

No. 4647.

United States Court of Appeals
First Circuit.

June 9, 1953.

Rehearing Denied June 26, 1953.

Marcel Mallet-Prevost, Washington, D. C., Attorney (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, and Marshall J. Seidman, all of Washington, D. C., Attorney, on brief), for petitioner.

Gerard D. Reilly, Washington, D. C. (Julius Kirle, Boston, Mass., and Reilly, Rhetts & Ruckelshaus, Washington, D. C., on brief), for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

In the petition now before us, the National Labor Relations Board asks us to enforce a Board order entered October 16, 1951, directing Reed & Prince Manufacturing Co., upon request, to bargain collectively with United Steelworkers of America, CIO, as the exclusive representative of all the production and maintenance employees of respondent at its plant at Worcester, Massachusetts. An earlier phase of this case is reported in N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 1952, 196 F.2d 755.

Because the Union on certain dates was out of compliance with the filing requirements of § 9(h) of the National Labor Relations Act, as amended, 61 Stat. 146, 29 U.S.C.A. § 159(h)—the non-Communist affidavit provisions—respondent raised certain technical objections which, if well-taken, would prevent our reaching the merits of the case. We say "technical", because, as we noted in N. L. R. B. v. Kobritz, 1 Cir., 1953, 201 F.2d 156, 157, "it not infrequently happens that a union completely above suspicion of Communist domination may fall temporarily out of compliance where, for example, a union officer dies or goes out of office and a brief delay occurs before his successor files the necessary affidavit." See also N. L. R. B. v. Dant & Russell, Ltd., 1953, 344 U.S. 375, 383–384, 73 S.Ct. 375.

■ The objection that the Board was without authority to issue the complaint in this case, because Local 1315 of the Union was temporarily out of compliance with § 9(h) on the date the original charge was filed, is authoritatively answered by N. L. R. B. v. Dant & Russell, Ltd., supra.

■ Respondent further contends that it was under no statutory duty to bargain with the certified Union because at the time the bargaining was initially requested, and for some months thereafter, Local 1315 had not complied with the filing requirements of § 9(h) of the Act. This objection was not taken at any time during the period of protracted negotiations between the Company and the Union; the Union's temporary noncompliance obviously had no bearing upon the issue of the Company's good faith in the conduct of the bargaining negotiations. The objection was distinctly an afterthought, raised for the first time in the Company's exceptions to the trial examiner's Intermediate Report. The short answer is that Congress has not made compliance with the filing requirements of §

9(f), (g) and (h) a condition precedent to the obligation of an employer under § 8(a)(5) to bargain collectively with the chosen representative of the employees; such compliance is merely made a condition precedent to invoking the machinery of the Act for the investigation of a question concerning representation, or for the issuance of a complaint charging the commission of unfair labor practices. It was so held in West Texas Utilities Co. v. N. L. R. B., 1950, 87 U.S.App.D.C. 179, 184 F.2d 233, 239, certiorari denied 1951, 341 U.S. 939. There was a contrary holding in N. L. R. B. v. Tennessee Egg Co., 6 Cir., 1952, 199 F.2d 95. But the judgment in the latter case has since been reversed and vacated by the court of appeals for the Sixth Circuit, 1953, 201 F.2d 370, in deference to the reasoning, if not to the holding, of the Supreme Court in N. L. R. B. v. Dant & Russell, Ltd., 1953, 344 U.S. 375, 73 S.Ct. 375.

■ Coming then to the merits, this is not a simple case where the employer has made a clear refusal to recognize or bargain with the certified representative of its employees. Rather, it is one where the employer engaged in a lengthy series of bargaining conferences, which got nowhere. In such a case the question is whether it is to be inferred from the totality of the employer's conduct that he went through the motions of negotiation as an elaborate pretense with no sincere desire to reach an agreement if possible, or that it bargained in good faith but was unable to arrive at an acceptable agreement with the union. Particularly in this area of mixed fact and law, a court will not lightly disregard the over-all appraisal of the situation by the Labor Board "as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456.

Section 8(a)(5) of the Act, 61 Stat. 141, makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees". Correspondingly, § 8(b)(3) makes it an unfair labor practice for a labor organization "to refuse to bargain collectively with an employer, provided it is the representative of his employees". More or less declaratory of the law as it had been expounded in judicial decisions under the original Act, § 8(d) of the Act, as amended, provides that for the purposes of this section "to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession".

■ It is true, as stated in N. L. R. B. v. American National Ins. Co., 1952, 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027, that the Board may not "sit in judgment upon the substantive terms of collective bargaining agreements." But at the same time it seems clear that if the Board is not to be blinded by empty talk and by the mere surface motions of collective bargaining, it must take some cognizance of the reasonableness of the positions taken by an employer in the course of bargaining negotiations. See Wilson & Co., Inc., v. N. L. R. B., 8 Cir., 1940, 115 F.2d 759, 763. See also Smith, The Evolution of the "Duty to Bargain" Concept in American Law, 39 Mich. L.Rev. 1065, 1108 (1941). Thus if an employer can find nothing whatever to agree to in an ordinary current-day contract submitted to him, or in some of the union's related minor requests, and if the employer makes not a single serious proposal meeting the union at least part way, then certainly the Board must be able to conclude that this is at least some evidence of bad faith, that is, of a desire not to reach an agreement with the union. In other words, while the Board cannot force an employer to make a "concession" on any specific issue or to adopt any particular position, the employer

is obliged to make *some* reasonable effort in *some* direction to compose his differences with the union, if § 8(a)(5) is to be read as imposing any substantial obligation at all.

After an attentive examination of the entire record of the bargaining negotiations herein, we are definitely of the opinion that this is a case in which, under the standard laid down in Universal Camera Corp. v. N. L. R. B., supra, we should accept the ultimate finding of the Board that respondent did not participate in the bargaining negotiations with the good faith required of it by law.

As the outcome of a representation proceeding and a subsequent election held on July 12, 1950, the Board on July 20, 1950, certified United Steelworkers of America, CIO, as the exclusive bargaining representative of certain of respondent's employees. There was no dispute at that time, nor is there now, as to the appropriateness of the designated bargaining unit. On or about August 1 following, the chief negotiator for the Union called upon respondent's president with the request for a bargaining conference as soon as convenient. He was informed by the president that because of other commitments no definite date could be set at that time. On or about August 9 the Company sent word to the Union that it would be impossible to arrange a meeting before Labor Day in view of the fact that various members of the Company's negotiating committee were on vacation until that time. After Labor Day it was finally agreed that the initial bargaining session would be held on September 15. In its decision the Board questioned "whether the Respondent would have delayed, for such a relatively long period of time, negotiations for a business contract or a bank loan it was desirous of concluding." The Board went on to say that although "the Respondent's conduct in this respect, standing alone, might be deemed equivocal, appraising it in the context of the Respondent's whole course of conduct we conclude that it was another aspect of the Respondent's calculated effort to avoid reaching an agreement with the Union while preserving the appearance of bargaining."

Meanwhile, on or about August 9, the Union by telephone requested permission to post certain non-controversial notices on the Company bulletin boards. It was told that this request could not be granted at that time but that the matter should be brought up at the first meeting. By letter of August 9 the Union requested respondent to furnish it with wage rates and classifications and the age and length of service of all employees in the bargaining unit, "In order to enable the United Steelworkers of America to bargain intelligently" with the Company. Although the Union made several further requests for this data, the Company did not supply it in full until some time in October. Commenting upon this, the Board observed that "the Respondent's delay in supplying the requested data may be viewed legitimately as a significant part of its entire course of conduct in determining whether or not the Respondent has exercised good faith in its bargaining negotiations with the Union."

On September 15 the first meeting took place as scheduled. Apparently the Union wanted to begin the discussions on a broad base, exploring potential areas of agreement and disagreement. The Company, however, insisted that the Union submit a written list of its contract proposals, which the Union immediately did.

Subsequently there were twelve further meetings between the parties running from the beginning of October through early in February, 1951. The first five of these conferences were devoted to a discussion of the suggested contract submitted by the Union. The principal Union proposals were (1) a substantial wage increase; (2) some form of union security, either a union shop or a maintenance of membership clause as an alternative; (3) a check-off provision; (4) a grievance procedure with arbitration as the ultimate resort; (5) six paid holidays annually; (6) a seniority provision, and (7) some form of insurance and pensions.

With respect to the matter of wages, the Company offered a general wage increase of ten cents per hour, with the express condition that if the offer were accepted there would be no further negotiations on this

subject. The Union, having originally requested fifteen cents, or maybe more, was unwilling to accept the offer on these terms; however, it repeatedly stated that it would regard all the various economic benefits as a single "package", and hence might be able to agree to the ten-cent increase, once the Company's position was made known on certain other demands, *e. g.*, pensions, insurance, and paid holidays.

The Company announced its general opposition on principle to any form of union security and to arbitration.

■ On the check-off proposal, the Company registered its opposition, mainly on the ground that this was not a proper subject of collective bargaining. In this the Company was mistaken. The Company added that in any event it could not accept a check-off provision because its administration would be too much of a bookkeeping burden. As the Board observed, an employer who takes the erroneous position that a particular subject matter is not bargainable "can hardly approach the discussion of this subject with an open mind and a willingness to reach an agreement."

As to the proposed grievance procedure, the Company took exception to the first step, providing that an employee complaining to his foreman be accompanied by the steward, and to the ultimate provision for arbitration. The Union manifested some willingness to yield on these matters, provided the other terms of the contract could be worked out. But when in response to the Company's request the Union submitted a more detailed proposal with reference to grievance procedure, the Company objected that this was too "complex". Apparently it did not point out any particulars in which the proposal might be simplified, though the Union claimed that it had submitted a typical grievance clause which worked effectively at other plants.

The Company also rejected the Union's demand for six paid holidays, referring to its current practice of giving year-end bonuses. When the Union urged the Company as an alternative to commit itself in the contract to a continuance of this practice, the Company declined.

The seniority proposal submitted by the Union was found by the Company to be unacceptable in various items, for instance, in the provision allowing seniority to accumulate during absences not exceeding two years on account of lay-offs or disability. Subsequently the Company submitted its own seniority proposal, which was culled from the 1941 contract negotiated between respondent and the labor organization then representing its employees.

Finally, as to pensions and insurance, the Company listened to an exposition by a union expert, but expressed the view that these areas were sufficiently covered by Social Security and Blue Cross, to both of which the Company contributed. It added, however, that it would consider the Union proposals and would offer some of its own, which so far as we can discover the Company never did. The Union submitted certain fairly detailed written proposals on the subject of pensions and insurance; but respondent's vice president, testifying before the trial examiner, conceded on cross-examination that the Company's final position on insurance and pensions was never communicated to the Union.

In addition to the foregoing major issues, there were several lesser items brought into the discussion:

(1) At the first meeting the Union again raised the question of bulletin board space. The Company replied that while it could not comply with this request, it might be able to arrange for posting of Union notices on plant gates. Despite repeated requests by the Union, the Company never took definite action in this matter. The Board observed that the granting of such posting permission is a common industrial practice, and expressed the opinion "that the Respondent's handling of the bulletin board matter, taken in the context of this case, indicates the Respondent's basic unwillingness to accept the principle of collective bargaining and further strengthens our conclusion that the Respondent has not bargained in good faith."

(2) At the end of the recognition clause proposed by the Union, the Company wanted to insert the first proviso of § 9(a) of

the statute, recognizing the right of individual employees to present grievances directly to the employer. The Union agreed to this on the condition that there also be inserted in the recognition clause the second proviso in § 9(a), "That the bargaining representative has been given opportunity to be present at such adjustment." The Company took this counter-suggestion under advisement, but presumably ultimately rejected it, since the recognition clause in the proposed contract which the Company submitted to the Union on November 22 contained only the first proviso of § 9(a). On this matter the Board stated: "We cannot conceive of a good faith basis for a refusal to incorporate a statutory obligation into a contract in the very words of the statute. This type of quibbling conduct is consistent only with the conclusion that there was bad, not good, faith bargaining."

(3) The Union suggested a 40-hour workweek with time and one-half on Saturday. The Company was unwilling to accept the latter point, feeling that time and one-half should begin only after an employee had already worked 40 hours during the week. Subsequently the Union came up with a modified proposal to the effect that employees who, in following management schedules, were required to work on Saturday should be paid time and a half, but that time and a half would not apply where an employee had to work on Saturday because he had lost time for personal reasons during the regular workweek. The modified proposal, however, was not accepted by the Company.

(4) Another provision in the proposed Union contract related to leaves of absence to be granted to employees "with the consent of the Union and the Company." The Company squelched this proposal on the ground that it was not its practice to grant such leaves of absence. However, at the hearing before the trial examiner the Board introduced in evidence a Company "Book of Information for Employees" which included this sentence: "This [section relating to employee service credits] does not apply to cases where the Management has granted in writing permission for Leave of Absence."

(5) During the course of the negotiations the Union pointed out that at present employees who were on a piece-work basis received insufficient information to compute their incentive pay. The Union requested the Company so far as possible to supply each employee with a daily record of what he had done on that particular day similar to a method being used by other companies. Respondent rejected this suggestion, claiming that it was impossible for it to make these computations.

By October 31, since no agreement had been reached on even the most minor matters, both sides seemed to feel that the negotiations were at an impasse. Nevertheless, there were seven further meetings. On or about November 10 the Union submitted a final proposed contract which was complete except for a wage clause. On November 22 the Company, in turn, submitted its first and only proposed "contract", to which we shall make further reference subsequently. Neither of these documents served to bring the parties any closer to an agreement.

On December 4 respondent announced to its employees that a Christmas bonus would be paid to them "in recognition of their loyalty during the past year", with the expression of hope "that we shall be able to continue the payment for many years to come." On December 5 respondent posted a notice stating: "Based on certain decisions of the National Labor Relations Board, the Management is now permitted to put into effect immediately the 10¢ an hour increase previously offered to the factory employees in the National Labor Relations Board bargaining unit." This notice the Board regarded as another aspect of respondent's "lack of good faith in the bargaining negotiations with the Union." The Board also went on to add: "[We have] frequently had occasion to point out that the unilateral granting of a wage increase during the course of negotiations with the legally constituted bargaining representative * * * is a violation of the Act. Such action necessarily has the effect

of undermining the representative status and prestige of the bargaining agent." While it was recognized that such a unilaterally announced wage increase might legally be made effective once the parties had reached, as a result of good faith bargaining, an impasse in the bargaining negotiations, it was the Board's view that the responsibility for the impasse here must be attributed to respondent's lack of good faith in the prior negotiations with the Union. It further found that "Respondent emphasized this bad faith by announcing the wage increase in such a way that the Union could not and did not in any way share the credit for it."

In the meantime the Union was becoming increasingly disturbed over what it called "the Company's bad faith" and the consequently decreasing likelihood of ever arriving at an agreement. On or about November 14 the Union reported to its membership that the Company was strongly against all the "basic provisions" suggested by the Union and that it appeared "that the Company is just stalling." Shortly thereafter the employees authorized a strike. At the December 27 meeting the Union advised the Company that there would be a strike at the plant effective January 2 "because they were not bargaining in good faith with the union". This strike was called, and was still in progress at the time of the hearing before the trial examiner.

Subsequently the federal and the Massachusetts conciliation services—which had come to play an active part in the negotiations—made several further, but unsuccessful, efforts to get the parties together. The Company told the conciliators that the parties were still bargaining and that it thought more progress could be made by direct negotiations between the Union and the Company, even though at the same time the Company admitted, as indeed it had to in order to sustain the validity of its unilateral announcement on December 5 of a wage increase, that the parties had reached an impasse. The conciliators suggested arbitration of the principal issues of disagreement, which proposal was accepted by the Union but not replied to by the Company. They also proposed various compromises, which the Company refused.

██ Shortly after the beginning of the strike, the Company initiated several back-to-work efforts. In this it was aided by one Donald Pierce, a Company stock expediter, who was entrusted with a Company car to furnish transportation to returning strikers. One employee testified that Pierce urged him to return to work "because Alden Reed [respondent's treasurer] is never going to sign a contract with the union" and told him that respondent "would rather sell the plant than sign a contract with the union." The admission of this testimony was strenuously objected to by respondent, but since Pierce was acting for the Company in these back-to-work activities, it seems clear that on ordinary agency principles the testimony as to Pierce's remark, which was uncontradicted, was properly let in as an admission by the Company.

Before us, respondent has sought to ascribe the undoubted stalemate to an adamant insistence by the Union upon acceptance of the basic provisions of its standard contract, submitted on a take-it-or-leave-it basis. As evidence of this, respondent relies upon certain expressions in a leaflet circulated by the Union negotiating committee to the employees, purporting to describe the bargaining meeting of November 14. But an examination of the record of the lengthy negotiations between the Company and the Union indicates that the Union's bargaining efforts were marked by a considerable flexibility of approach, for the Union negotiator at many important points submitted modifications of its proposals in an effort to meet Company objections. It even appears that the Union might have been willing to accept a contract with no union security provision or arbitration clause in it if the other provisions could have been worked out acceptably.

The plain fact is that after months of negotiations, as the Board observed, "practically all the Union could report to its membership in the way of progress was the 10-cent wage offer—freely given by the Respondent in an inflationary period of rising

wages." Even in minor matters, such as the Union's request for use of the Company bulletin board, and the Union's request that the second proviso of § 9(a) of the Act be inserted in the recognition clause, the Company withheld assent. The Company's asserted justification for this is that it was "bargaining technique". But it may be wondered how the Company could in good faith ever expect to arrive at an agreement if the major proposals submitted by the Union are refused on principle and assent on the minor ones is withheld as a matter of bargaining technique.

■ In sustaining the Board's ultimate conclusion of lack of good faith, as deduced from the record as a whole and from the totality of respondent's conduct in its bargaining relations with the Union, we do not necessarily have to sustain the Board on each and every one of its subsidiary findings of fact. As stated in N.L.R.B. v. Newport News Shipbuilding & Dry Dock Co., 1939, 308 U.S. 241, 247, 60 S.Ct. 203, 207, 84 L.Ed. 219: "We do not stop to consider these contentions, since, without such findings, there would still be a basis in the record for the Board's conclusions." As a matter of fact most of the underlying facts, certainly the more significant ones, are not in dispute.

Nor do we have to agree with the Board as to each and every one of the incidents which it specially emphasized in its decision as indicating a lack of good faith on the Company's part in the conduct of the bargaining negotiations. For instance, we are not inclined to agree with the Board that the Company's insistence, over the Union's strenuous objection, on having a stenotypist present at all the bargaining meetings to take down a verbatim transcript of the proceedings was evidence of the Company's bad faith. On the other hand, we think that the Board might well have lifted out from the record another item for special comment, as indicative of bad faith on the Company's part. We refer to the fact that, after discussion at several meetings of the Union's various proposals of items to be included in the contract, the Company on November 22 submitted its own proposal of a so-called contract. This was a brief two-page document containing a recognition clause which paraphrased the first proviso of § 9(a) of the Act but made no reference to the second proviso, and contained a provision as to hours of work substantially copied from its 1941 agreement, but had no provisions as to wages, grievance procedure, or the other major items which the Union had proposed for inclusion in the contract. It is difficult to believe that the Company with a straight face and in good faith could have supposed that this proposal had the slightest chance of acceptance by a self-respecting union, or even that it might advance the negotiations by affording a basis of discussion; rather, it looks more like a stalling tactic by a party bent upon maintaining the pretense of bargaining.

There may be cases where the ultimate finding of an administrative agency rests in part upon findings of subsidiary fact, or inferences therefrom, which a reviewing court deems insupportable, and where, because the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous findings or inferences removed from the picture, it may be appropriate for the court to remand the case to the administrative agency for further consideration. But in view of the record in its entirety, we are satisfied that this is not such a case.

■ After reviewing the facts and stating its conclusion on the record as a whole, the Board in its decision had this to say: "We have scrupulously avoided prejudging the Respondent because of its rather unsavory labor relations history, but the Board is not required by law to ignore this history. Accordingly, in evaluating the evidence in this case, we have given some weight to this factor." Respondent contends that the Board committed a glaring error in taking account of this factor and that for this reason the Board order should be set aside. We do not think it would be error, in a case like this, for the Board to take account of the prior history of the Company's labor relations, as disclosed in the prior record of which the Board might take judicial notice. The ultimate issue

whether the Company conducted its bargaining negotiations in good faith involves a finding of motive or state of mind which can only be inferred from circumstantial evidence. It is similar to the inquiry whether an employer discharged an employee for union activity, or for some other reason, where the prior history of the employer's labor relations, whether good or bad, may be relevant. However, we do not stop to consider the contention at length, for in this case it is evident that the Board's reference to this factor was only as a makeweight, in support of a conclusion which the Board deemed inescapable from the present record—and a very light makeweight at that, for the Board went on to say that it was "not unmindful of the fact that from 1941 to 1945, as a result of the Court decree, the Respondent had contractual relations with the Union."

■ Finally, respondent contends that the trial examiner committed error in rejecting an offer of proof by counsel for respondent "that this strike has been prolonged by the violence of the union, and that had it not been for the violence of the union, the employees would have voted, through the union, to have returned to work." Of course such evidence would have had no bearing upon the issue of the alleged already accrued 8(a) (5) unfair labor practice which provoked the strike. Nor would the Union, at least in the absence of most extraordinary circumstances, thereby forfeit its status as the certified bargaining representative. Despite instances of violence in the course of such a strike, the Board would not be obliged to withhold an order upon respondent to bargain collectively with the Union, upon future request, as an appropriate remedial measure to undo the effect of the past unfair labor practice. Under the circumstances the Board had considerable discretion in the matter of inquiry into alleged incidents of Union violence during the strike. We do not find that the Board committed any abuse of discretion in excluding respondent's very generalized offer of proof.

A decree will be entered enforcing the order of the Board.