MONTGOMERY COUNTY COUNCIL OF SUPPORTING
SERVICES EMPLOYEES, INC. *v.* BOARD OF
EDUCATION OF MONTGOMERY
COUNTY ET AL.

[No. 120, September Term, 1975.]

*Decided April 7, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ■O'DONNELL, JJ.

*Marvin E. Preis* and *Thomas P. Powers*, with whom were *Steven M. Cooper* and *Douglas J. Adams* on the brief, for appellant.

*Robert S. Bourbon* for appellees.

LEVINE, J., delivered the opinion of the Court.

This is an appeal from an order of the Circuit Court for Montgomery County dismissing a petition for injunctive relief filed by appellant, the Montgomery County Council of Supporting Services Employees, Inc. (MCCSSE), bargaining agent for the noncertificated employees of the Board of Education of Montgomery County (the School Board), appellee herein. In its bill of complaint, MCCSSE sought to enforce the terms of a collective bargaining agreement between it and the School Board. *See Western Md. Dairy v. Chenowith,* 180 Md. 236, 23 A. 2d 660 (1942). Additionally, MCCSSE sought to enjoin the disbursement of funds for increases in pay under a plan adopted by the School Board. MCCSSE alleged a failure of the School Board to engage with it in good faith negotiations respecting the allocation of funds appropriated by the Montgomery County Council for cost-of-living increases in wages and salaries, in violation of the collective bargaining agreement and Maryland Code (1957, 1975 Repl. Vol.) Art. 77, § 160A (j).

The circuit court (Mitchell, J.) found that the School Board had negotiated in good faith with MCCSSE and therefore denied the requested relief. An appeal to the Court of Special Appeals followed, but we granted a writ of certiorari prior to consideration by that court. Because we find sufficient evidence in the record to support the conclusion of the circuit court, we shall affirm.

The employees of the School Board are represented by two unions. The teachers and administrative staff are represented by the Montgomery County Education Association (MCEA), and the supporting services personnel are represented by MCCSSE. In 1974 MCCSSE, as bargaining agent for the supporting services personnel, entered into a collective bargaining agreement with the School Board. The term of the agreement being two years, there was included a cost-of-living escalator clause to be applied to rates of pay in the second year. The escalator clause called for a percentage annual increase in the various pay schedules based on a formula taking into account changes in the consumer price index. An identical clause was also made part of the agreement between the School Board and MCEA, apparently as a result of an arbitration decision providing that a percentage increase, as opposed to an increase in a flat dollar amount, should be applied to all employees of the School Board. The application of the formula, all parties agree, would have produced a 10.1% increase in the salary schedules beginning July 1, 1975.

This case was precipitated by the failure of the Montgomery County Council (the Council) to appropriate the amount necessary to fund the full 10.1% increase. Although the School Board sought full funding in its budget request, after numerous meetings the Council settled on a lesser sum. By Resolution No. 8-218, the Council appropriated an amount for a cost-of-living adjustment equal "to $750 per manyear in the various [county] budgets . . . the distribution of this cost of living allowance to be determined by the agencies according to their procedures." The term "manyear" is a term of art meaning, with respect to the

Board of Education, a full-time position of employment. The amount requested by the School Board for full funding of the 10.1% increase for all of its employees was approximately $19.6 million. The total amount actually appropriated by the Council, determined by multiplying $750 by the number of full-time positions with the School Board, was about $9.1 million. The School Board, pursuant to the authority vested in it by Resolution No. 8-218 to determine the distribution of the amount appropriated and by Art. 77, § 160A (1) to render the final determination as to matters subject to negotiation, after several negotiating sessions with MCCSSE, granted a 5.46% increase in all of its salary schedules, thus using the entire amount appropriated for that purpose. MCCSSE then instituted this action.

The authority of the Council to appropriate any amount which in the exercise of its discretion it deems proper, including an amount insufficient to fund contractual pay increases, is unquestioned. Indeed, this contingency is anticipated in § 160A of Article 77, which provides:

> "(j) *Funding negotiated agreements* ... If the fiscal authority does not approve sufficient funds to implement the negotiated agreement, the public school employer is required to renegotiate the funds allocated for such purposes by the fiscal authority with the employee organization prior to making a final determination . . . ."

To the same effect, Article V, § 13 of the collective bargaining agreement provides:

> "If the Montgomery County Council, in the new exercise of its fiscal authority under the law, reduces the budget recommendations of the Board of Education, and such action makes it necessary for the Board to reduce one or more items that have been negotiated, such items and all other negotiated items that are dependent upon budget funding shall be subject to renegotiation. . . ."

First, MCCSSE argues on appeal that its members are entitled, at a minimum, to the equivalent of $750 per employee. It contends that wages and salaries for supporting services personnel constitute a separate budget category for purposes of legislative funding, and that the effect of Resolution No. 8-218 was to appropriate to the supporting services "category" an amount equal to $750 times the number of supporting services positions, about $3.6 million. Because the supporting services employees earn on the average an amount somewhat less than that earned by the professional employees, only about $2.5 million would be distributed in the form of pay increases to supporting services personnel under the 5.46% plan adopted by the School Board. Allocation to supporting services wages and salaries of the $3.6 million sought by the MCCSSE would result in an average increase of 7.9% in the supporting services schedules, and an increase for professional employees averaging somewhat less than the 5.46% which, under the School Board plan, all employees would receive.

There is no merit in the argument of MCCSSE. Section 117 (e) of Article 77 provides in part that "[a]ll revenues received by each county board of education shall be expended by them in accordance with the major categories of its annual budget as provided for by this section." There is in § 117, however, no category for wages and salaries of supporting services personnel. Rather, supporting services positions are provided for in several of the major budget categories. Indeed, a great number of those positions is included in Category 2, "Instructional salaries," which also includes the bulk of the professional positions. Section 117 (e) specifically provides that funds may be freely transferred within the major categories by the boards of education.

Moreover, § 117 (e) further provides that transfers between major categories may be made "with the approval of the . . . county council." The Council, in its Resolution No. 8-218, allowed "the distribution of this cost of living allowance to be determined by the agencies." Thus, the necessary authority for intercategory transfer of funds was provided in the funding resolution itself.

MCCSSE next contends that the School Board violated § 160A (j) of Art. 77 and Article V, § 13 of the collective bargaining agreement by refusing to negotiate *in fact* over the distribution of the funds appropriated. The basis for this contention is the refusal of the School Board to accept the position taken by MCCSSE that negotiation must start with the $750-per-employee figure. As discussed above, however, the School Board was under no obligation to begin negotiations at that or any other figure. Therefore, its refusal to accept the $750 figure as a minimum did not constitute a refusal in fact to negotiate.

But the thrust of the MCCSSE argument is that the School Board refused to negotiate in good faith. Subsection h of § 160A specifically provides that with respect to negotiations relating to salaries, wages, hours and working conditions, the term "negotiate" includes the duty to confer in good faith. Likewise, the duty to confer in good faith may also be fairly implied with respect to the contractual obligation, contained in Article V, § 13 of the collective bargaining agreement, to renegotiate items subject to reduced funding. The federal cases applying §§ 8 (a) (5) and 8 (b) (3) of the National Labor Relations Act, 29 U.S.C. § 158 (a) (5) and (b) (3), are particularly instructive in this regard, though their lesson must be tempered with a recognition of the fact that those decisions were reached in the posture of review of administrative rulings.[1]

The requirement of good faith is a subjective measure which can be applied only in light of the totality of the circumstances. It is not required that the parties reach agreement; nor is it even necessary that concessions be made. *Labor Board v. Jones & Laughlin*, 301 U. S. 1, 45, 57 S. Ct. 615, 81 L. Ed. 893 (1937); *National Labor Relations Bd. v. Reed & Prince Mfg. Co.*, 205 F. 2d 131, 134 (1st Cir.), *cert.*

---

1. Section 8 (d) of the National Labor Relations Act, 29 U.S.C. § 158 (d), specifically imposes a duty to confer in good faith. It should be noted, perhaps, that the National Labor Relations Board has deemed several types of conduct to be per se violations of the NLRA. *See* Labor Board v. Katz, 369 U. S. 736, 742-43, 82 S. Ct. 1107, 8 L.Ed.2d 230 (1962). Such inflexible rules are not appropriate in this context. Rather, such conduct is only evidence of subjective bad faith of the parties.

*denied,* 346 U. S. 887 (1953); *National Labor Rel. Board v. Montgomery Ward & Co.,* 133 F. 2d 676, 687 (9th Cir. 1943). Somewhat paradoxically, perhaps, the cases suggest that a "desire to reach agreement" constitutes good faith bargaining, and conversely that a "desire not to reach an agreement" is bad faith; condemned is a "predetermined resolve not to budge from an initial position," and required is "a serious attempt to resolve differences and reach a common ground." *See N.L.R.B. v. General Electric Company,* 418 F. 2d 736, 761-62 (2d Cir. 1969), *cert. denied,* 397 U. S. 965 (1970).

The difficulty, as noted in the *General Electric* case, is in trying to legislate a state of mind. The task in applying the good faith standard is to distinguish, upon the facts of each case, between a party genuinely participating in negotiations, listening to and evaluating proposals made by the other side and attempting to explain its own position, with a willingness to persuade and be persuaded, and a party merely "going through the motions" with a "predetermined resolve not to budge from an initial position." *See Labor Board v. Truitt Mfg. Co.,* 351 U. S. 149, 154-55, 76 S. Ct. 753, 100 L. Ed. 1027 (1956) (Frankfurter, J., concurring); *Singer Mfg. Co. v. National Labor Relations Board,* 119 F. 2d 131, 134 (7th Cir.), *cert. denied,* 313 U.S. 595 (1941); *National Labor Relations Board v. Boss Mfg. Co.,* 118 F. 2d 187, 189 (7th Cir. 1941). The rationale for requiring good faith negotiations, despite the difficulties in enforcement, was succinctly stated in Cox, *The Duty to Bargain in Good Faith,* 71 Harv. L. Rev. 1401, 1412 (1958):

> "Participation in debate often produces changes in a seemingly fixed position either because new facts are brought to light or because the strengths and weaknesses of the several arguments become apparent. Sometimes the parties hit upon some novel compromise of an issue which has been thrashed over and over. Much is gained by giving each side a better picture of the strength of the other's convictions."

Application of the good faith standard is further complicated in this case by at least two additional factors. First, unlike the private employer, the School Board here necessarily enters into negotiations with a limited amount of money with which to bargain. Lacking independent taxing authority, it could only spend the amount appropriated by the County Council. And secondly, the School Board has been given the statutory duty to make the final determination in these matters, Code (1957, 1975 Repl. Vol.) Art. 77, § 160A (l), a duty also recognized in the collective bargaining agreement, Article V, § 12, which provides:

> "The Montgomery County Board of Education shall render the final determination as to all matters which have been the subject of negotiation, but this final determination shall be subject to other provisions of this Agreement concerning the fiscal relationship between the public school employer and the Montgomery County Council."

*See San Juan Teachers Ass'n v. San Juan Unified School Dist.*, 44 Cal. App.3d 232, 118 Cal. Rptr. 662, 673 (1974).

An examination of the facts in this case reveals ample evidence to support the determination of the circuit court that the School Board negotiated in good faith with MCCSSE. After the action by the County Council, a series of five meetings was held during a one-month period in which negotiators for the parties discussed the distribution of the funds. At no time did School Board negotiators refuse to meet with MCCSSE.

Much is made of the fact that the School Board never budged from its initial offer. Indeed, School Board representatives repeatedly referred to the 5.46% plan as "the only way to go." As already noted, however, it is not bad faith to adhere to a position genuinely and sincerely held. *N.L.R.B. v. Almeida Bus Lines, Inc.*, 333 F. 2d 729, 731 (1st Cir. 1964); *N.L.R.B. v. Herman Sausage Co.*, 275 F. 2d 229, 231 (5th Cir. 1960). Here the School Board distributed all of the funds made available to it. The final allocation was made on the same basis as that made in the contracts between the

School Board and the two bargaining units, MCEA and MCCSSE, arrived at through arbitration. To take the position, as the School Board did, that the only fair way to allocate the appropriated funds was on an equal percentage basis to all of its employees is clearly not so unreasonable as to constitute evidence of bad faith, *i.e.*, a desire not to reach an agreement. *See National Labor Relations Bd. v. Reed & Prince Mfg. Co., supra,* 205 F. 2d at 134. On the contrary, these facts strongly support the inference that the School Board's insistence was pursuant to a sincerely held belief in the equity of its position.

Furthermore, numerous concessions were made by the School Board, albeit in areas other than direct pay increases. MCCSSE was evidently offered such inducements as a shorter work year, increases in life insurance coverage, and an upgrading of the employee benefit plan including improved dental coverage, a new visual care plan and a prescription drug plan. The School Board also offered to convert the 5.46% increase to an equivalent flat $541-per-employee increase for supporting services personnel. The fact that the School Board offer was submitted to a vote of the MCCSSE membership is some evidence that it was more than mere window dressing.

There is no evidence that the School Board failed to give careful consideration to the proposals put forth by MCCSSE. In fact, the evidence tends to show that the School Board carefully evaluated a proposal that various cuts be made elsewhere in the School Board budget to release funds for a further pay increase, a proposal that was rejected by the School Board as being detrimental to the educational needs of the students. The only other significant proposal put forth by MCCSSE was the $750-per-employee demand which, for reasons already discussed, was likewise ultimately rejected.

Indeed, MCCSSE never wavered from its position, taken at the commencement of negotiations, that the minimum acceptable amount was a $750-per-employee allocation or its equivalent. Throughout the negotiations, MCCSSE asserted its "right" to such an amount. This adamant insistence by

MCCSSE on its position is no less evidence of a refusal to negotiate in good faith than was the insistence of the School Board on the plan it proposed.

Several specific acts of the School Board are proffered as circumstantial evidence from which a finding of bad faith should have been inferred by the circuit court. We find these arguments unpersuasive.

On May 21, the date of the first meeting of the parties, the School Board issued a press release explaining the action of the County Council and outlining its position with respect to the distribution of funds. Article V, § 5 of the collective bargaining agreement specifically prohibited the disclosure of "the specific content of any given proposal" and required consultation in advance with respect to the content of all press and public communications. It is argued that such public posturing in advance of negotiations is evidence of a mind closed to counterproposals. Further, the danger generally in publicizing a position is that it may tend to lock the party into that position because a concession would tend to compromise its pride and reputation for truthfulness. *See N.L.R.B. v. General Electric Company, supra,* 418 F. 2d at 764 (concurring opinion). In sum, the taking of public positions in advance of negotiations is not conducive to reaching agreement. Cox, *The Duty to Bargain in Good Faith, supra* at 1436.

The press release in the instant case, however, was not of a type designed to undermine the negotiating process. The proposals of the School Board were announced in the release as recommendations only. It was carefully noted that "[t]he next step in the renegotiation process is expected to be counterproposals from the employee organizations, after study of the Board's recommendation . . . [that] will be the subject of further bargaining sessions." When the MCCSSE negotiators registered objection to the release, School Board representatives attempted to have it withdrawn, but were unsuccessful, apparently as the result of an inadvertent premature release. Therefore, though the release was technically in violation of the collective bargaining agreement and may have been evidence of bad faith, we cannot

conclude that the circuit court was clearly erroneous in its finding of overall good faith in the totality of the circumstances.

MCCSSE also argues that the School Board acted in bad faith in failing to inform the MCCSSE negotiators of the possibility of transferring funds between major budget categories to provide additional money for salary increases. The authority for such transfers, with approval of the County Council, is provided in Article 77, § 117 (e) of the Code. MCCSSE asserts that this failure to apprise them of facts they deem essential to these negotiations constituted strong evidence of bad faith.

Under certain circumstances, the failure to supply pertinent information may warrant a finding of bad faith bargaining. *Labor Board v. Truitt Mfg. Co., supra,* 351 U. S. at 152-53; *N.L.R.B. v. United Brass Works, Inc.,* 287 F. 2d 689, 696 (4th Cir. 1961). Such a finding, however, is not warranted here. The School Board did not claim that it was prohibited from making intercategory transfers. MCCSSE cannot claim, then, that its negotiators were misled. And while the refusal to provide pertinent information requested by a party may constitute bad faith, *N.L.R.B. v. General Electric Company, supra,* 418 F. 2d at 749-53, where, as here, there has been no request for information, such a claim of bad faith is greatly attenuated. Furthermore, there is no evidence that the MCCSSE negotiators were in any way prejudiced by the alleged failure of the School Board to enlighten them as to this matter, which is plainly set out in the Maryland Code. Proposals put forth by MCCSSE calling for cuts in other areas of the budget seem clearly to have contemplated such transfers. It might well be inferred that the School Board was operating under the assumption that MCCSSE knew of the explicit statutory authority for intercategory transfers.

Finally, it is argued that the School Board acted in bad faith when it unilaterally instituted a 5.46% wage increase after the final meeting on June 17. Generally, the unilateral institution by an employer of a change in conditions of employment under negotiation constitutes bad faith. *Labor*

*Board v. Katz,* 369 U. S. 736, 743, 82 S. Ct. 1107, 8 L.Ed.2d 230 (1962); *Labor Board v. Crompton Mills,* 337 U. S. 217, 223, 69 S. Ct. 960, 93 L. Ed. 1320 (1949). Such action is tantamount to a refusal to bargain since the bargaining process is, in effect, thereby abandoned. *See May Stores Co. v. Labor Board,* 326 U. S. 376, 385, 66 S. Ct. 203, 90 L. Ed. 145 (1945). It is not bad faith, however, to initiate a program already offered to the union once negotiations have reached an impasse. *Labor Board v. Crompton Mills, supra,* 337 U. S. at 224; Cox, *The Duty to Bargain in Good Faith, supra* at 1423.

In the instant case, it was one of the MCCSSE negotiators who declared on June 4, at the next to last meeting, that the negotiations were at an impasse. At the final meeting on June 17, negotiators for the School Board offered to meet again with representatives of MCCSSE, but their offer was declined. At this point, the School Board undoubtedly was entitled to initiate its own plan, that plan having already been offered to MCCSSE. To hold otherwise would be to give the union the power to thwart any change in a matter subject to negotiation. The negotiations having reached an impasse, it was not an act of bad faith for the School Board to implement a 5.46% increase in the rates of pay without the agreement of MCCSSE.

We hold there was sufficient evidence to support the finding by the circuit court of good faith on the part of the School Board in its negotiations with MCCSSE over cost-of-living increases in wages and salaries in fiscal year 1975 under the collective bargaining agreement.

*Judgment affirmed; appellant to pay costs.*