473 A.2d 47

**Charles HELFERSTAY, et al.**

v.

**Ronald E. CREAMER, et al., T/A Weinberg & Green.**

**No. 677, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

April 5, 1984.

David Freishtat, Baltimore, with whom were Paul Mark Sandler, M. Theresa McDonough and Freishtat & Sandler, Baltimore, on brief, for appellants.

J. Alan Galbraith, Washington, D.C., with whom were Brendan V. Sullivan, Jr., Michael S. Sundermeyer and Williams & Connolly, Washington, D.C. and M. Natalie McSherry and Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, on brief, for appellees.

Argued before MOYLAN, LISS and BELL, JJ.

LISS, Judge.

This case represents an appeal by Charles Helferstay, *et al.,* appellants (hereinafter the Investors), from a denial by the Superior Court (now Circuit Court) for Baltimore City, of their motion for equitable relief and replication on equitable grounds. The appeal is taken from a November 8, 1982 oral ruling by Judge David Ross in favor of the appellees, Ronald E. Creamer, individually, and t/a the law firm of Weinberg and Green (hereinafter W & G).

The underlying litigation in this case began on July 9, 1976, when the Investors brought suit against W & G and against individual members of the firm. In *Creamer v. Helferstay,* 294 Md. 107, 448 A.2d 332 (1982), the Court of Appeals summarized the facts upon which this continuing dispute is based: [1]

Several limited partners of a real estate partnership which had invested in a land venture known as the Route

---

1. For a more extensive discussion of the factual background, *see* the opinion of this Court in *Creamer v. Helferstay,* 47 Md.App. 243, 244–52, 422 A.2d 395 (1980).

29—Lewis Property Partnership, brought suit in the Superior Court of Baltimore City against the Baltimore law firm of Weinberg & Green and several of its partners individually, alleging negligent breach of fiduciary duties, breach of contract and fraud. These allegations arose out of the law firm's concurrent representation of the real estate limited partnership and of the general partner thereof (who is not a party to this case). In essence, the limited partners claimed that Weinberg & Green's representation of the general partner personally, and its relationships with him in business dealings, had created a conflict of interest and had resulted in financial loss to the limited partners. The limited partners alleged that Weinberg & Green had had a duty to disclose the full extent of its relations with the general partner and that, had it made this disclosure, the limited partners would not have invested in the partnership. The limited partners sought compensatory damages and, under the fraud count, punitive damages. Weinberg & Green counterclaimed for damages, alleging that, to the extent that the law firm caused the limited partnership to have lost money, the loss was due to the failure of certain of the limited partners to have disclosed information to the law firm which would have enabled the venture to have been profitable.

Responding to the suggestion of the trial judge presiding in the case, the parties negotiated a partial settlement agreement which was signed on October 24, 1979. The limited partners agreed to dismiss with prejudice the fraud count and to release Weinberg & Green from all other claims of fraud or conspiracy relating to the real estate partnership. Weinberg & Green agreed to dismiss its counterclaim, and "to enter into good faith settlement negotiations" on the negligence and breach of contract counts. The following provision was also included in the written agreement:

"This agreement ... constitute[s] the entire agreement of the parties. There are no additional promises made

by the parties except those expressly set forth in this agreement."

Pursuant to the settlement agreement, the fraud count and the counterclaim were dismissed. Thereafter, the parties met three times to negotiate on the remaining counts, and at the third meeting Weinberg & Green offered $80,000 in settlement. The limited partners rejected this offer, and, as found by the trial court, their counsel "immediately announced his intention to seek rescission [of the settlement agreement] and acted upon that intention the following day by filing the motion for appropriate relief."

The limited partners argued that the settlement agreement should be rescinded and the fraud count reinstated because, they alleged, Weinberg & Green had intentionally made "false representations" during the negotiations which had induced the limited partners to enter into the settlement agreement. Specifically, the limited partners alleged that during negotiations they had repeatedly stated that any settlement would have to be in the range of $275,000 to $550,000. Weinberg & Green, however, refused during those negotiations to agree expressly in writing or orally to a specific settlement range. Nevertheless, the limited partners claimed that, by certain statements, the law firm had caused them to understand that, even though the settlement agreement provided only for "good faith settlement negotiations," in reality the agreement was different. According to the limited partners, the law firm represented that, as soon as the fraud count was dropped, the law firm would offer to settle for between $275,000 and $550,000.

In an opinion, the trial court found that there was "no evidence of intentional misrepresentation" by Weinberg & Green. However, the court did find that Weinberg & Green had made an "honest misrepresentation" which had induced in the respondents the belief that Weinberg & Green intended to negotiate a settlement in the $275,000–$550,000 range. The court further found that the limited

partners had entered into the settlement agreement in reliance upon this misrepresentation. The trial court entered an order rescinding the settlement agreement and reinstating the counterclaim and the fraud counts. The trial court based his order of rescission on the alternative grounds of misrepresentation and unilateral mistake. Weinberg & Green appealed to the Court of Special Appeals which affirmed on the ground of unilateral mistake. *Creamer v. Helferstay,* 47 Md.App. 243, 422 A.2d 395 (1980). The law firm then filed a petition for a writ of certiorari, arguing that neither misrepresentation nor unilateral mistake furnished grounds for rescission of the settlement agreement under the circumstances of this case. [Footnotes omitted]. [294 Md. at 109–12, 448 A.2d 332].

The Court of Appeals vacated this Court's judgment and remanded with instructions to vacate the judgment of the Superior Court and remand for further proceedings not inconsistent with that opinion. The Court noted "[t]he Superior Court of Balitmore City was clearly without the power to order rescission of the settlement agreement in this case . . . ." As a result, the dismissed claims in the underlying (1976) litigation, including Investors' fraud-conspiracy count, remained dismissed with prejudice pursuant to the dismissals filed in connection with the partial settlement agreement. The Court of Appeals advised, however, that upon remand the Investors "may be able to invoke Rule 342 d. 1 and make the argument or file a replication that grounds exist upon which a court of equity would rescind the settlement agreement." 294 Md. at 115–16, 448 A.2d 332. Because the Court of Appeals envisioned the possibility of further proceedings upon remand, the Court furnished guidance on the two legal issues raised by W & G in its certiorari petition and then in its brief, specifically instructing the trial court to permit appellants to present additional evidence and raise issues in addition to misrepresentation and unilateral mistake "such as the meaning of the term 'good faith settlement negotiations' and whether the law

firm breached their contractual promise, thereby relieving the limited partners from their obligations under the settlement agreement." *Id.,* at 132–33, 448 A.2d 332.

Appellants subsequently filed a replication on equitable grounds, alleging intentional misrepresentation, negligent misrepresentation, breach of contract, fraud, estoppel and mutual mistake.

On November 8, 1982, the trial court ruled against the appellants on each ground alleged. Judge Ross reiterated his 1979 ruling that the Investors were not induced to enter the partial settlement agreement through fraud, nor was the agreement induced by mutual mistake.[2] The Investors' estoppel argument was rejected on the ground that the conduct by W & G about which the Investors complained preceded the partial settlement agreement, but under the opinion of the Court of Appeals, the contract controlled.[3]

Judge Ross concluded that negligent misrepresentation was the tort side of innocent misrepresentation, and ruled that negligent misrepresentation was therefore not a viable ground for equitable relief under the opinion of the Court of Appeals in this case.

Judge Ross then stated, "That brings us down, as I read it, as I analyze it, to the final and only viable remaining basis for relief for the plaintiffs, and that is the question of breach of contract. There are two parts of that issue. (1) What does the contract mean; and (2) taking that meaning, was the contract breached." Judge Ross held that "good faith negotiations" was an *un*ambiguous term and that it was therefore to be accorded its objective meaning. He then defined its objective meaning, and found as a fact that W & G negotiator Howard Miller negotiated in good faith.

Finally, Judge Ross addressed Investors' contention that W & G improperly invoked attorney-client privilege to fore-

---

2. The Investors have not challenged these rulings on appeal.

3. The Investors have not challenged this ruling on appeal.

close inquiry into conversations that W & G negotiator Howard Miller had with W & G attorneys in the course of educating himself about the underlying 1976 litigation against W & G. Judge Ross ruled that the assertion of privilege was proper, and that, even if he were to draw an adverse inference from the assertion of privilege, such adverse inference would not change the result.

The docket entries indicate that at the conclusion of Judge Ross's oral opinion an order was entered denying the Investors' motion for appropriate relief. The Investors have appealed from that order pursuant to the "collateral order" doctrine[4] and have raised the following issues:

(1) Whether the Superior Court's determination that the Court of Appeals in its 1982 opinion in this case (*Creamer v. Helferstay*, 294 Md. 107, 448 A.2d 332) foreclosed negligent misrepresentation as a ground for rescinding the 1979 partial settlement agreement was proper?

2. Whether the Superior Court correctly ruled that "good faith settlement negotiations" is a straightforward term which is not ambiguous and, therefore, capable of a single definition?

3. Whether the trial court's conclusion that settlement negotiations were conducted in good faith as required by agreement of the parties was clearly erroneous?

4. Whether appellees' assertion of attorney/client privilege precludes proof of their claim of having negotiated in "good faith"?

### 1.

■ Appellants contend initially that since the partial settlement agreement with the appellees was the product of negligent misrepresentation, the trial court could have and should have refused to enforce the settlement agreement

---

**4.** For a discussion of the "collateral order" doctrine, *see Clark v. Elza*, 286 Md. 208, 406 A.2d 922 (1979).

and should have treated it as invalid. The trial judge, however, ruled that parol evidence was inadmissible in a factual context where the parol evidence would explain or contradict the terms of an integrated written contract. Appellants acknowledge that parol evidence is not admissible to alter, vary or contradict the terms of an integrated writing. They urge, however, that parol evidence is admissible to prove that the contract was obtained by means of untrue statements or by negligent misrepresentations. 3 Corbin *Contracts,* Sec. 573 n. 3 (1982 Supp.); Restatement (Second) of Agency Sec. 257, n (c) (1958).

Appellants have furnished the Court with a well prepared and well reasoned discussion of the parol evidence rule as it applies to the tort of negligent misrepresentation. They seek to find a basis for the rescissions of the partial settlement agreement in the refusal of the trial court to permit them to introduce parol evidence to establish the negligent misrepresentation which they contend was proof of the failure of the appellees to engage in "good faith settlement negotiations." We do not agree. In its opinion, the Court of Appeals advised that the "honest misrepresentation" found by Judge Ross was not actionable because it conflicted with the express language in the integration clause. *Creamer v. Helferstay,* 294 Md., *supra,* at 120–21, 448 A.2d 332.

The trial court rejected appellants' effort to reclassify the misrepresentation from an honest misrepresentation to a negligent misrepresentation when it said:

> I indicated previously, and I have not been persuaded to the contrary, negligent misrepresentation is what we were talking about in 1979. As far as I can ascertain, or understand, the innocent misrepresentation, nonfraudulent, conduct which induced the error of the plaintiffs is the contract side of the tort of negligent misrepresentation. However, I am satisfied from reading the opinion of the Court of Appeals that they are not suggesting to us that because they have not decided expressly in a tort case that the parol evidence rule is applicable, that it is inapplicable in a factual context such as that presented in this

case. They did not mean to say that we should come back and see if there was somehow negligence in the conduct of the defendants here which would make it a slightly different factual situation than that which prompted the first decision, and then say that the parol evidence rule doesn't apply this time, and send it back down. I just don't read that as being a viable alternative in this case under the opinion of the Court of Appeals.

Appellants rely heavily on the case of *Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 439 A.2d 534 (1982) in which they contend the Maryland Court of Appeals embraced the theory that negligent misrepresentation may be shown by parol evidence even if the misrepresentation contradicts an integrated written contract. It must be noted that *Creamer v. Helferstay,* 294 Md. 107, 448 A.2d 332, *supra,* was decided after *Martens* and that the Court of Appeals unequivocally stated that the misrepresentation found by Judge Ross in the trial below was *not* actionable because it was in conflict with two provisions ("good faith settlement negotiations" and the integration clause) of the partial settlement agreement.

W & G deny they made any misrepresentation during the negotiations which preceded the partial settlement agreement. Their position seems to have been sustained by Judge Ross when he stated:

All of the statements and conduct, including silence of the defendant, and their representatives, at the October 23 meeting, are consistent with the terms of the proposal which they were making. One has to realize that both sides entered that meeting, that is October 23, 1979, with firm positions which they had resolved to maintain, and that this was the first negotiating meeting between the parties.

In this context, one expects to hear from the other side demands or offers stated in absolute terms which are viewed as just that, demands or offers. The defendants had firmly resolved not to discuss dollars, and they meant it. The only way the defendants were willing to discuss

dollars or money or amounts or figures was without the existence of the fraud count.

The proposal was that Miller would negotiate in good faith, and the statements of the parties or the defendants and their representatives can all be read consistently with that proposal. As far as the defendants' reaction to the demands and statements with respect to amounts below which the case would not settle and how much was needed to settle the case, one, as I said, must look at it in the light of being in the first negotiating session. And there is no reason not to expect the defendants, who are number one, maintaining a firm position not to discuss dollars, to view those statements as nothing more than posturing and demands looking towards future discussions of figures.

As we read the Court of Appeals opinion in *Creamer v. Helferstay,* 294 Md. 107, 448 A.2d 332, *supra,* a noncontractual misrepresentation absent fraud or mutual mistake could not in equity be a proper ground for ordering the rescission of a performed written integrated contract.

### 2. and 3.

Appellants next argue that the trial judge erred when he ruled that parol evidence as to the meaning of the term "good faith settlement negotiations" was inadmissible. Judge Ross held that the term "good faith settlement negotiations must be given its objective meaning." He explained:

> I am satisfied that the contract language in this case, i.e., that Howard Miller would engage in good faith negotiations, must be given its objective meaning; that we can not impose upon those words any gloss based on the precontract conversation, negotiations, representations, silence, or what have you. Good faith negotiations is a straight-forward term which is not ambiguous. It might be difficult to define, but it is not ambiguous.

Appellants concede that parol evidence may not be admitted to vary, explain or contradict the written contract but this rule does not preclude the admission of parol evidence to

explain an ambiguous term. *See Mascaro v. Snelling and Snelling of Baltimore, Inc.,* 250 Md. 215, 229, 243 A.2d 1, *cert. denied,* 393 U.S. 981, 89 S.Ct. 451, 21 L.Ed.2d 442 (1968). Appellants maintain that the contractual term "good faith settlement negotiations" included in the partial settlement agreement is ambiguous, and has no clear legal, objective definition and that parol evidence was therefore admissible. Appellants contend that they *reasonably* understood the term to mean that W & G "intended to negotiate settlement on the basis of the economic factors of cost of defense and loss of productivity to W & G during trial; i.e., on a business basis which would make the plaintiffs substantially whole." The appellees claim that the term meant to negotiate a settlement based solely on Miller's honest, intelligent and subjective evaluation of W & G's exposure of liability to the plaintiffs. From these divergent positions appellants conclude that the term is ambiguous and that parol evidence was therefore admissible to explain the meaning of the term as intended by the parties, and that the trial judge erred in excluding the parol evidence. We do not agree.

There are cases in which agreements to negotiate in good faith have been held to be unenforceable because of vagueness. *See, e.g., Necchi S.P.A. v. Necchi Sewing Machine Sales Corp.,* 348 F.2d 693 (2d Cir.1965), *cert. den.,* 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966) and *Candid Productions, Inc. v. International Skating Union,* 530 F.Supp. 1330 (S.D.N.Y.1982). They have been compared to "agreements to agree" which are unenforceable for the same reason. *First National Bank of Maryland v. Burton, Parsons and Company,* 57 Md.App. 437, 470 A.2d 822 (1984).[5] On the other hand, because of a unique statutory and social history, the requirement of bargaining in good faith has become a well-defined and well-understood term in the field of labor law. *See Montgomery County Council of Supporting Services Employees, Inc. v. Board of Education of Montgomery*

---

5. In the case at bar, neither side raised the issue of unenforceability of the agreement, so it is not before us.

*County,* 277 Md. 343, 354 A.2d 781 (1976). And in some other limited situations, an agreement to negotiate in good faith may be upheld. One of these occurs when the provision for good faith negotiations is part of an otherwise enforceable contract which itself provides terms or a frame of reference by which the duty to negotiate may be evaluated. *DeLaurentiis v. Cinematografica De Los Americas S.A.,* 9 N.Y.2d 503, 215 N.Y.S.2d 60, 174 N.E.2d 736 (1961).

We think this case falls into the latter category. There is an otherwise valid settlement agreement which provided the framework for the agreement to negotiate. The only argument as to this aspect of the case is whether the term "good faith negotiations" was ambiguous within this framework. Given this narrowly-defined context, it is appropriate to apply the labor law definition of good faith, as set forth by the Court of Appeals in *Montgomery County Council of Services Employees, supra,* 277 Md. at 349–50, 354 A.2d 781:

> The requirement of good faith is a subjective measure which can be applied only in light of the totality of the circumstances. It is not required that the parties reach agreement; nor is it even necessary that concessions be made. [Citations omitted]. Somewhat paradoxically, perhaps, the cases suggest that a "desire to reach agreement" constitutes good faith bargaining, and conversely that a "desire not to reach an agreement" is bad faith; condemned is a "predetermined resolve not to budge from an initial position," and required is "a serious attempt to resolve differences and reach a common ground." [Citations omitted]. . . . The task in applying the good faith standard is to distinguish, upon the facts of each case, between a party genuinely participating in negotiations, listening to and evaluating proposals made by the other side and attempting to explain its own position, with a willingness to persuade and be persuaded, and a party merely "going through the motions" with a "predetermined resolve not to budge from an initial position." [Citations omitted]. The rationale for requiring good

faith negotiations, despite the difficulties in enforcement, was succinctly stated in Cox, *The Duty to Bargain in Good Faith,* 71 Harv.L.Rev. 1401, 1412 (1958):

Participation in debate often produces changes in a seemingly fixed position either because new facts are brought to light or because the strengths and weaknesses of the several arguments become apparent. Sometimes the parties hit upon some novel compromise of an issue which has been thrashed over and over. Much is gained by giving each side a better picture of the strength of the other's convictions.

We conclude that Judge Ross was correct in according the term its objective meaning. As the Court of Appeals said, in *Ray v. Eurice,* 201 Md. 115, 127, 93 A.2d 272 (1952), "[f]inally, where there has been an integration of an agreement, those who executed it will not be allowed to place their own interpretation on what it means or was intended to mean. The test in such case is objective and not subjective." [Citations omitted]. The Court also said, in *The Kasten Construction Co. v. Rod Enterprises, Inc.,* 268 Md. 318, 328, 301 A.2d 12 (1973), "But, where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed." [Citations omitted]. We find no error in Judge Ross's ruling.

■ Appellants point out that one of the tasks assigned to the trial judge by the remand in *Creamer v. Helferstay,* 294 Md. 107, 448 A.2d 332, *supra,* was to determine whether the appellees (W & G) breached their contractual promise to negotiate in good faith thereby relieving the appellants from their obligations under the partial settlement agreement. Appellants maintain that Miller was required, by all the circumstances testified to in the case, to negotiate a settlement amount based on the estimated cost of defense of the suit and W & G's loss of productivity during the course of defense. W & G argues that "good faith settlement negotiations" meant that Miller would make an honest, intelligent

evaluation of W & G's exposure of liability and base settlement offers on his own evaluation. Judge Ross defined Miller's duty under the partial settlement agreement as to "be willing to sit down, to discuss and to listen, and to be prepared to reach a settlement, which he the negotiator, based on everything he knows, thinks is appropriate."

The trial judge had before him Miller's extensive testimony in the 1979 hearing. Miller testified again in the 1982 hearing and the court advised that he had re-read the 1979 testimony. The judge had the benefit of observing Miller's demeanor as a witness on both occasions. The crucial decision required of the court was the evaluation of the witness Miller's credibility. Judge Ross found as a fact that Miller had negotiated in good faith. Under the strictures imposed by Maryland Rule 1086 we cannot say that Judge Ross's finding was clearly erroneous.

We note that in reading the testimony it seems clear to us that the initial settlement conference was unsuccessful because the parties came into the session with divergent views as to the starting point for negotiations. It is even more clear that, thereafter, the proceedings were governed by anger and disappointment and that no negotiations followed. We cannot under those circumstances assess blame on either party.

4.

Under the unusual circumstances of this case, Miller, in implementing the requirement of the partial settlement agreement, was required to discuss the facts and the law with W & G and with Ms. McSherry and Mr. Whiteford, who were counsel representing W & G.

Miller testified that from information received during his conversation with counsel for appellants, Mr. Frieshtat, certain concerns arose. As a result, Miller testified, he had several conversations with McSherry and Whiteford, through which he was able to resolve these concerns and the position to be taken by W & G in response thereto. During cross-examination, counsel for the appellants sought on sev-

eral occasions to question Miller concerning his conversations with McSherry and Whiteford. On each occasion, objection was interposed on the ground of attorney/client privilege and was sustained by the trial judge. Appellants argue that since the appellees invoked the privilege as a "shield" to protect themselves from the disclosure of facts which were a legitimate subject of inquiry, the trial court should have held as a matter of law that appellees waived their claim that they acted in good faith.

In support of their position, appellants offer no Maryland authority but rely on a 1963 Missouri case, *Randazzo v. Polizzi*, 366 S.W.2d 380 (Mo.1963) and a 1936 N.Y. case, *Shafer v. Utica Mutual Insurance Co.*, 248 App.Div. 279, 289 N.Y.S. 577 (N.Y.App.Div.1936). A close reading of these cases, however, reveals that they are not applicable in the case at bar.

In *Randazzo,* the plaintiff in a personal injury case complained that he should not have been required to testify on cross-examination to conversations with his attorney as to the extent of his injuries. The Missouri Court held the inquiry was proper under Missouri law since plaintiff, having alleged certain injuries and testified about them on direct, was open to inquiry as to whether he had communicated these facts to his attorney. We doubt the same result would have been reached under Maryland law. *Shafer* is distinguishable from the instant case on both the facts and the law. In *Shafer,* the insurance company contended that the plaintiff had not cooperated with the company as required by the policy but had instead conspired with his daughter to obtain a recovery against the insurance carrier. The carrier disclaimed liability and sought to confront the insured with a statement given by him to the attorney, who also represented the insurance company. That statement was substantially altered by a later statement which supported the insured daughter's claim for damages. The plaintiff successfully invoked the attorney/client privilege. That result was reversed on appeal on the basis that the facts represented an exception to the attorney/client privi-

lege when the court held "When an attorney acts for two parties having a common interest, communications by the parties to the attorney are not privileged in a controversy between the same two parties. Such communication is deemed a relative but not an absolute confidence." *See also Liberty Mutual Insurance Co. v. Engels,* 41 Misc.2d 49, 244 N.Y.S.2d 983, 986 (N.Y.Sup.Ct.1963), where the court said "the attorney client privilege may not be used as a sword instead of a shield."

■ In Maryland, the attorney/client privilege prohibits the disclosure, without the consent of the client, of *all* confidential communications between attorney and client during the course of professional service. In *State v. Pratt,* 284 Md. 516, 519–20, 398 A.2d 421, 423 (1979), the Court of Appeals described the scope of the privilege:

> In this State the attorney-client privilege, deeply rooted in common law and now memorialized in section 9–108 of the Maryland Code's (1974) Courts Article, is a rule of evidence that forever bars disclosure, without the consent of the client, of all communications that pass in confidence between the client and his attorney during the course of professional employment or as an incident of professional intercourse between them. [Citations omitted]. [Footnote omitted]. The privilege is based upon the public policy that "an individual in a free society should be encouraged to consult with his attorney whose function is to counsel and advise him and he should be free from apprehension of compelled disclosures by his legal advisor." [Citations omitted]. While never given an explicit constitutional underpinning, the privilege is, nevertheless, closely tied to the federal, as well as this State's, constitutional guarantees of effective assistance of counsel and could, if limited too severely, make these basic guarantees virtually meaningless. [Citations omitted].

*See also Levitsky v. Prince George's County,* 50 Md.App. 484, 491, 439 A.2d 600, 604 (1982).

■ We conclude that Judge Ross was correct in his holding that the attorney/client privilege in Maryland precluded inquiry into conversations between attorney and client.

ORDER AFFIRMED, COSTS TO BE PAID BY APPELLANTS.