[Civ. No. 47509. Second Dist., Div. Four. June 15, 1977.]

WESTERN CAMPS, INC., Plaintiff and Respondent, v.
RIVERWAY RANCH ENTERPRISES et al.,
Defendants and Appellants.

718

**COUNSEL**

Frank R. Catallo, White, Oberthansley & Fleming, David W. Fleming, Edward L. Lascher, Wendy C. Wilner and Albert J. Garcia for Defendants and Appellants.

Paul Kallman and Edward Seltzer for Plaintiff and Respondent.

## OPINION

DUNN, J.—Plaintiff Western Camps, Inc., a California corporation, commenced an action for negligent misrepresentation, fraud and breach of contract against defendants Riverway Ranch Enterprises, a limited partnership, and Wallace McCoy, one of the limited partners,[1] seeking damages for defendants' alleged wrongful termination of their sublease of real property to plaintiff. The complaint alleged that such termination was caused by the forfeiture of defendant Riverway's lease of the property from the owners thereof, upon defendant's failure to exercise certain options to purchase real property, the exercise of such options being necessary to keep the lease in force.

The action was tried by the court without a jury. Evidence was produced showing: by a written lease executed June 25, 1965, Constructors Research Corporation, a California corporation (hereinafter CRC) leased approximately 40 acres of land in Tulare County from the owners of the land; concurrently with its execution of the lease, CRC executed an agreement to purchase real property and options to purchase real property; said agreement provided, in substance, that CRC would purchase certain land, and have options to purchase additional land each year from 1967-1973, including the land subject to the lease; the lease provided that its term would continue only so long as CRC (lessee) continued to exercise the options set forth in the agreement, and that if it failed to exercise any one of the options "then this lease shall terminate and Lessee shall forthwith surrender the possession of said demised premises"; in October 1965 defendant Riverway Ranch Enterprises, a limited partnership, was formed, with CRC as the general partner and defendant McCoy as one of the limited partners; thereafter, CRC assigned to Riverway all of CRC's right, title and interest under the lease and the agreement; by a written sublease executed in 1966 Riverway subleased the 40 acres to plaintiff for the period June 21 - September 20, 1967, with an option to lease the property for a like period during 1968, 1969 and 1970; plaintiff conducted a summer camp for children on the leased premises, and wished to negotiate a new, long-term sublease with Riverway; for this purpose, Stanford Oken, the president of plaintiff corporation, and Leonard Mann, one of its shareholders, met with defendant McCoy on August 10, 1970; at that meeting, McCoy said that

---

[1] Other limited partners also were made defendants. Pursuant to stipulation of the parties, the action was dismissed as to these defendants at the beginning of the trial, leaving only Riverway Ranch Enterprises and McCoy as defendants.

Riverway would give plaintiff a 10-year sublease if plaintiff would agree to put $25,000 worth of improvements on the property; McCoy also required plaintiff to pay $5,000 at the time of executing the sublease, such sum to be applied to the rent for the final three-month period of the term of the sublease; Mann said that plaintiff would not spend $25,000 for improvements without some assurance that it would be able to occupy the property for the entire 10-year term; Oken and Mann expressed concern that the sublease might be terminated prematurely if Riverway failed to exercise the options under the 1965 purchase-option agreement, if it sold the leased premises,[2] or if a portion thereof were condemned by the state for a highway; in order to protect plaintiff if the sublease were terminated, Oken suggested a provision for payment of $60,000 to plaintiff upon termination; McCoy agreed to such a provision; he also agreed that if the sublease were terminated, Riverway would reimburse plaintiff for the improvements made by it, and also would refund to plaintiff the $5,000 rental deposit; on the basis of these discussions, a sublease was drafted by plaintiff's attorney; on August 13, 1970, Oken and McCoy met to review that instrument, make any necessary change in it, and sign it; among the changes made were the following: Oken and McCoy deleted paragraph 31, which gave plaintiff the right to purchase the demised premises in the event that Riverway chose to sell such premises prior to termination of the sublease; to paragraph 30, entitled "Warranty Of Possession," was added a provision giving plaintiff the right to exercise Riverway's options to purchase should Riverway elect not to exercise such options; with these changes the sublease, as executed by the parties, read in pertinent part as follows, the *italicized* portion of paragraph 30 indicating the addition thereto: "(29) TERMINATION: [¶] Lessor shall have the right to terminate this Lease, upon the following terms and conditions: [¶] 1. Lessor shall give written notice to Lessee on or before September 30 of any calendar year of the term of this Lease of its intention to terminate, with such notice effective June 15 of the following calendar year. [¶] 2. If Lessor shall give written notice of its intention to terminate in accordance with the above, Lessor shall pay to Lessee the sum of Sixty Thousand Dollars

---

[2]The land comprising Riverway Ranch consisted of 1,356 acres. Pursuant to its purchase-option agreement, CRC purchased 110 acres of such land upon execution of the agreement, and had options to purchase the remaining 1,246 acres. Under the 10-year sublease, plaintiff leased from defendant Riverway 40 acres of the land which was subject to the options. During the term of the sublease, defendant, by exercising its options, would have purchased the land covered by the sublease. Following such purchases, defendant would have been in a position to sell the land whereas, at the time of executing the sublease, it could not have done so, having been then merely the lessor rather than the owner of the land.

($60,000.00) plus the cost to Lessee of its improvements to the demised premises less accumulated depreciation of such improvements . . . . ; if such termination shall precede the last three (3) month term of this Lease, the Five Thousand Dollars ($5,000.00) deposit . . . shall be repaid by Lessor to Lessee"; "(30) WARRANTY OF POSSESSION: [¶] Lessor hereby represents and warrants to Lessee that it is rightfully in possession of the demised premises under and in accordance with that certain Lease dated June 25, 1965, between Lessor, on the one hand, and T. Clifton Jones, et al., on the other hand, and that no consent of such other parties is necessary relative to this Lease and the occupancy and possession by Lessee of the demised premises during the term of this Lease; *provided, however, in the event Lessor shall not choose to complete performance of the option provisions of said lease, Lessor shall advise Lessee of such fact in writing within a reasonable time prior to the date for any such performance, and Lessee shall have the right to accomplish such a performance on its own behalf*."

The evidence also showed: at the meeting of August 13th, McCoy told Oken that Riverway could not allow plaintiff to become an "intermediary" in any potential sale of the demised premises during the term of the sublease; accordingly, at McCoy's request, paragraph 31 was stricken; Oken then asked that plaintiff be given the right to exercise Riverway's options to purchase in the event that Riverway decided not to exercise the options; Oken told McCoy that such a right would be "additional protection" for plaintiff to remain on the property throughout the term of the sublease, and that plaintiff could use the $60,000 termination fee in exercising the options to purchase; McCoy agreed to give plaintiff the right to exercise the options; Oken then telephoned plaintiff's attorney, who dictated to Oken the provision which he hand-printed on the lease as an addition to paragraph 30; Oken and McCoy did not discuss what effect, if any, plaintiff's right to exercise the options would have on the termination provisions of paragraph 29; the parties executed the sublease on August 13, 1970, Oken signing for plaintiff and McCoy signing for Riverway; thereafter, Riverway exercised one option to purchase but decided not to exercise any further options, and so informed plaintiff in a letter to Oken dated October 27, 1971; plaintiff was unable to raise the money necessary to exercise the options; plaintiff received no written notice from Riverway expressly terminating the sublease.

Findings of fact and conclusions of law were signed and filed. Regarding Riverway's lease, its purchase-option agreement, and the

execution of the sublease of August 13, 1970, the trial court found the facts substantially in accordance with the evidence summarized above. Further findings of fact included the following: the exercise by Riverway of its options to purchase, by continuance of the option payments, was a condition precedent to Riverway's right to maintain its lease and to sublease to plaintiff; on execution of the sublease, plaintiff paid to defendants the sum of $5,000 as payment of a portion of the rent due for the final three-month period of the term of the sublease; prior to October 27, 1971, plaintiff spent $23,600 in improving the demised premises; McCoy exercised complete management and control over all of the negotiations for, and the execution of, the sublease. As conclusions of law, the court determined: neither the amplification of paragraph 30 of the sublease, nor any other act or conduct of the parties, operated to nullify the provisions of paragraph 29; the acts and conduct of defendants constituted a termination of the sublease within the meaning of paragraph 29; the letter of October 27, 1971, was effective to terminate the sublease; "in connection with the sublease and its termination," McCoy conducted himself as a general partner of Riverway, and he is liable as a general partner for the obligations of Riverway.

Judgment was entered in favor of plaintiff and against defendants Riverway and McCoy in the sum of $117,445.51.[3] Defendants appeal from the judgment, contending: (1) the trial court incorrectly interpreted paragraph 29 of the sublease to mean that termination of that lease occurred upon Riverway's failure to exercise its options to purchase; and (2) the termination fee of $60,000, as provided in paragraph 29, is an unlawful penalty, and therefore cannot be recovered by plaintiff. In addition, McCoy contends that, as a limited partner of Riverway, he was not liable for its obligations under the sublease.

I

The trial court properly admitted extrinsic evidence to ascertain the meaning of paragraphs 29 and 30 of the sublease. (See *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38-40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Moss Dev. Co.* v. *Geary* (1974) 41 Cal.App.3d 1, 9 [115 Cal.Rptr. 736].) There was no conflict in

---

[3] This sum included: $82,737.53 as principal ($14,737.53 for the net depreciated cost of improvements to the demised premises, $60,000 for defendants' "privilege" of terminating the sublease, $5,000 for refund of the rental deposit, and $3,000 for defendants' share of certain improvements); $19,707.98 as interest; and $15,000 for attorneys' fees.

that evidence. Therefore, we are not bound by the trial court's interpretation of the sublease, but must make an independent interpretation of its meaning. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Los Banos Gravel Co.* v. *Freeman* (1976) 58 Cal.App.3d 785, 791-792 [130 Cal.Rptr. 180]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 257-260, pp. 4248-4251.) The possibility that conflicting inferences can be drawn from the evidence does not relieve us of the duty independently to interpret the instrument. (*Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385].)

■ In the interpretation of contracts, the paramount consideration is the intention of the contracting parties ". . . as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636; *Stewart Title Co.* v. *Herbert* (1970) 6 Cal.App.3d 957, 963 [96 Cal.Rptr. 631].) This intention must be ascertained from the words used, after taking into consideration the entire contract and the circumstances under which it was made, including the object, nature and subject matter of the contract, and the preliminary negotiations between the parties. (Civ. Code, § 1647; Code Civ. Proc., § 1860; *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at pp. 39-40; *Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761 [128 P.2d 665]; *Dunne and Gaston* v. *Keltner* (1975) 50 Cal.App.3d 560, 564 [123 Cal.Rptr. 430]; *In re Marriage of Williams* (1972) 29 Cal.App.3d 368, 378 [105 Cal.Rptr. 406]; *Rabinowitch* v. *Cal. Western Gas Co.* (1967) 257 Cal.App.2d 150, 156 [65 Cal.Rptr. 1].)

■ ■ Paragraph 29 of the sublease gave Riverway the right to terminate the sublease upon giving plaintiff written notice of termination.[4] The word "terminate" is nowhere defined in the sublease, but in a contract that word generally is used in its ordinary and popular meaning, i.e., "to end," "to put an end to." (*Martter* v. *Byers* (1946) 75 Cal.App.2d 375, 380 [171 P.2d 101].) ■ When Riverway failed to exercise further options to purchase, its lease ended (terminated) by its own terms, and the sublease thereupon likewise ended. (See *Scott* v. *Mullins* (1962) 211

---

[4]Riverway gave plaintiff no notice of termination, as required in paragraph 29 of the sublease. However, a provision requiring notice of the exercise of an option to terminate a lease is not construed strictly, but it is sufficient if the intention of the party to exercise the option is fairly communicated. (*Zumwalt* v. *Hargrave* (1945) 71 Cal.App.2d 415, 420 [162 P.2d 957].) Accordingly, the trial court correctly concluded that the letter of October 27, 1971, in which Riverway informed plaintiff of its intention not to exercise further options to purchase, was effective notice of termination of the sublease.

Cal.App.2d 51, 54-55 [27 Cal.Rptr. 269]; *Herman* v. *Campbell* (1948) 86 Cal.App.2d 762, 765-766 [195 P.2d 801].) Evidence of the negotiations between the parties shows that they intended the termination provision to apply if the sublease were terminated for any reason, including Riverway's failure to exercise the options necessary to keep its lease in force. Thus, Oken testified: "Well, I had told R. McCoy that we would be willing to put in the improvement money but we wanted some security and knowing that we would be there at the ranch and in the event that our lease was terminated *for any reason* prior to that that we would have to have some protection and we had—I had suggested a $60,000 termination clause and Dr. McCoy had agreed that that was acceptable to him. . . . I had indicated that we would be willing to put the $25,000 of improvements into the property if we had security and that *in the event that Constructors Research Corporation did not pick up their option* or if they sold their property that it would take . . . about $60,000 for us to relocate and reestablish and Dr. McCoy had told me that there was absolutely no chance they would not pick up the option . . . and that our position would be secure; and in that case I said he would not then object to a $60,000 termination fee and he agreed that that would be acceptable to him." (Italics added.)

█ Defendants argue that Riverway's failure to exercise the options to purchase did not "terminate" the sublease within the meaning of paragraph 29 because plaintiff, by taking advantage of its right to exercise the options as provided in paragraph 30, could have prevented the forfeiture of the lease and the concomitant termination of the sublease. We do not agree with defendants' interpretation. In regard to the purpose of the addendum to paragraph 30, giving plaintiff the right to exercise the options to purchase, Oken testified: "I told Dr. McCoy that we wanted the right to pick up their options in the event that they do not pick them up, that that was *additional protection* on our part to stay there. That was my primary concern and in that we had already agreed upon the $60,000. . . . Some of this money could have been used for picking up the options." (Italics added.) Thus, contrary to defendants' contention, it was not the intention of the parties that, if Riverway decided not to exercise its options, plaintiff's only recourse was to exercise the options on its own behalf. Rather, it was their intention that Riverway's failure to exercise the options would constitute a termination of the sublease under paragraph 29, unless plaintiff chose to avail itself of the right, under paragraph 30, timely to exercise the options on its own behalf. Certainly, it cannot be said that plaintiff was bound to exercise

the options in order to prevent a termination of the lease, and hence of the sublease.

Defendants argue that since plaintiff drafted the addendum to paragraph 30, its language must be construed most strongly against plaintiff. (Civ. Code, § 1654.) However, this rule applies only "[i]n cases of uncertainty not removed by the preceding rules." (*Id.,* see also *Felt* v. *L. B. Frederick Co.* (1949) 92 Cal.App.2d 157, 160-161 [206 P.2d 676].) One of the "preceding rules" is set forth in Civil Code section 1649: "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." Since Riverway agreed, in paragraph 30, to give plaintiff the right to exercise the options to purchase, Riverway was the promisor, and Oken's statement to McCoy, quoted above, could have left no doubt in McCoy's mind that plaintiff (the promisee) understood paragraph 30 to mean that if Riverway did not exercise the options, the sublease would terminate under paragraph 29, and that paragraph 30 merely gave plaintiff a means of preventing termination if it chose to, and was able to, exercise the options.

## II

█   Defendants contend the termination fee of $60,000 is a provision for liquidated damages under Civil Code section 1670, and is void because it does not comply with the requirements of section 1671. This point was not raised by defendants in the trial court, and was not considered by the court *sua sponte.* Nevertheless, since Civil Code section 1670 is an expression of the public policy of this state (*Cook* v. *King Manor and Convalescent Hospital* (1974) 40 Cal.App.3d 782, 792-793 [115 Cal.Rptr. 471]), we must consider the point because a court, at any stage of the proceeding, "has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids." (*Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 147-148 [308 P.2d 713].)

Civil Code section 1670 provides: "Every contract by which the amount of damage to be paid, or other compensation to be made, for a *breach of an obligation,* is determined in anticipation thereof, is to that extent void, except as expressly provided in the next section." (Italics added.) █   Thus, the initial inquiry is whether the $60,000 was

payable for "breach of an obligation." Plaintiff contends it was not, because Riverway's duty to pay the $60,000 arose upon its termination of the sublease, in accordance with the right granted to it therein, not upon its breach of the sublease. This contention finds support in *Kuhlemeier* v. *Lack* (1942) 50 Cal.App.2d 802 [123 P.2d 918]. In that case, a lease gave the lessee the right to terminate the lease at his election, and further provided that upon such termination he would forfeit his rental deposit. The court held that such provision did not come within Civil Code section 1670 because the lessee was not to forfeit the deposit for any breach of duty on his part, but rather was to surrender the money as consideration for his right to terminate the lease, such right being expressly granted therein. A similar conclusion was reached in *Blank* v. *Borden* (1974) 11 Cal.3d 963 [115 Cal.Rptr. 31, 524 P.2d 127]. There, the Supreme Court held that a withdrawal-from-sale provision in an exclusive right-to-sell contract between an owner of real property and a real estate broker is lawful and enforceable, and that compensation under such a provision does not constitute damages for breach of contract within the meaning of section 1670, but is payment of indebtedness under the express terms of the contract.

Defendants contend such principle is inapplicable here, and that the termination fee of $60,000 is invalid as a penalty under *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731 [108 Cal.Rptr. 845, 511 P.2d 1197]. We disagree. In *Garrett*, the court was called upon to construe a clause in a promissory note which provided that if payments of either principal or interest on the note became in default, an additional charge could be made by the holder of the note. The Supreme Court concluded that such provision was an attempt to coerce timely payment by the imposition of an extra charge which had no relation to the actual damages sustained by the lender in the event of late payment; therefore, the additional charge was void as a penalty. (9 Cal.3d at p. 740.) That situation is distinguishable from the situation presented in *Blank* v. *Borden, supra,* 11 Cal.3d 963, wherein the Supreme Court, in discussing the *Garrett* case, stated (p. 971): "Clearly this arrangement, viewed from the time of making the contract, realistically contemplates no element of free rational choice on the part of the obligor insofar as his performance is concerned; rather the agreement is founded upon the assumption that that obligor will make the lower payment. In these circumstances . . . 'the only purpose and effect of the formal alternative is to hold over [the obligor] the larger liability as a threat to induce prompt payment of the lesser sum.' . . . [¶] In the instant case, on the other hand,

the contract clearly reserves to the owner the power to make a realistic and rational choice in the future with respect to the subject matter of the contract. Rather than allowing the broker to proceed with efforts to sell the property, the owner, in the event that at any time during the term of the contract he changes his mind and decides not to sell after all, may withdraw the property from the market upon payment of a sum certain. *In these circumstances the contract is truly one which contemplates alternative performance, not one in which the formal alternative conceals a penalty for failure to perform the main promise.*" (Italics added.)

In the present case, paragraph 29 of the sublease expressly gave the lessor (defendant Riverway) the right to terminate the lease upon paying $60,000 to the lessee (plaintiff). The negotiations between the parties prior to their execution of the lease show that Riverway contemplated selling the property, during the term of the lease, for development as a recreational area, and therefore was willing to pay plaintiff $60,000 for the right to terminate the lease. Thus, defendant McCoy told Oken and Mann: "If we sell Riverway Ranch, it's going to be a bonanza, and whatever we pay you is a pittance, and we don't want you standing in our way of that development." Oken asked for $60,000 to cover plaintiff's cost of relocating its facilities, and defendant agreed. Under these circumstances, it is clear that the purpose and effect of paragraph 29 was to permit defendant Riverway to buy out plaintiff's estate for an agreed price. Accordingly, the provision for payment of $60,000 to plaintiff by Riverway upon its termination of the sublease was a bargained-for, alternative performance on its part, not a provision for liquidated damages, upon its breach of the lease agreement, within the meaning of Civil Code section 1670.

## III

Defendant McCoy contends the trial court erred in concluding that McCoy, a limited partner, was liable as a general partner for the obligations of the limited partnership (defendant Riverway) under the sublease.

A limited partner is not bound by the obligations of the limited partnership, and is not liable as a general partner, unless he takes part in the control of the partnership business. (Corp. Code, §§ 15501, 15507, subd. (a).) The trial court found that at the time the sublease was negotiated McCoy, in addition to being a limited partner, also was one of

the three officers, directors and shareholders of CRC, the corporate general partner. The court further found that McCoy exercised complete management and control in the negotiations for the sublease and in its termination, and acted without the advice or guidance of the other officers and directors of CRC. Pointing out that a corporation may be a general partner in a limited partnership (Corp. Code, §§ 15002, 15501), and that a corporation may act only through its agents (*Gardner* v. *Jonathan Club* (1950) 35 Cal.2d 343, 348 [217 P.2d 961]; *Herring* v. *Fisher* (1952) 110 Cal.App.2d 322, 330 [242 P.2d 963]), McCoy argues that he is not liable as a general partner because, in the transactions regarding the sublease, he was acting in his capacity as agent of the corporate general partner, not in his capacity as a limited partner. ■ The question thus presented is whether a limited partner in a limited partnership becomes liable as a general partner if he takes part in the control of the partnership business while acting as an agent of the corporation which is the sole general partner of the limited partnership.

This question apparently has not been considered in California. In two other jurisdictions, conflicting conclusions have been reached on the point. In *Delaney* v. *Fidelity Lease Limited* (Tex. 1975) 526 S.W.2d 543, 545, it was held that "the personal liability, which attaches to a limited partner when 'he takes part in the control and management of the business,' cannot be evaded merely by acting through a corporation." The court rejected the argument that, for the purpose of fixing personal liability upon a limited partner, the "control" test should be coupled with a determination of whether the limited partner held himself out as being a general partner having personal liability to the extent that the third party (or plaintiff) relied upon the limited partner's general liability. In this regard, the opinion pointed out that section 7 of the Uniform Limited Partnership Act simply provides that a limited partner who takes part in the control of the business subjects himself to personal liability as a general partner,[5] and does not mention any requirement of reliance on the part of the party attempting to hold the limited partner personally liable. The court further expressed concern that the statutory requirement of at least one general partner with general liability in a limited partnership could be circumvented by limited partners operating the partnership through a corporation with minimum capitalization and, therefore, with limited liability.

---

[5]In California, such provision is contained in Corporations Code section 15507, subdivision (a), which reads: "A limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business."

In *Frigidaire Sales Corp.* v. *Union Properties, Inc.* (1976) 14 Wn.App. 634 [544 P.2d 781], the court rejected the reasoning of the *Delaney* case and concluded that the dominant consideration in determining the personal liability of a limited partner is reliance by the third party, not control by the limited partner. It was there stated (pp. 784-785): "If a corporate general partner in a limited partnership is organized without sufficient capitalization so that it was foreseeable that it would not have sufficient assets to meet its obligations, the corporate entity could be disregarded to avoid injustice. We find no substantive difference between the creditor who does business with a corporation that is the general partner in a limited partnership and a creditor who simply does business with a corporation. In the absence of fraud or other inequitable conduct, the corporate entity should be respected. . . . Here, there was an overt intention to regard the corporate entity and no showing of the violation of any duty owing to the creditor. The creditor dealt with the corporate general partner in full awareness of the corporate status of the general partner. There is no showing of any fraud, wrong or injustice perpetrated upon the creditor, merely that [section 7 of the Uniform Limited Partnership Act] provides that a limited partner becomes liable as a general partner if he takes part in the control of the business. [Citation.] When these are the circumstances, we hold that the corporate entity should be upheld rather than the statute applied blindly with no inquiry as to the purpose it seeks to achieve. . . . A limited partner is made liable as a general partner when he participates in the 'control' of the business in order to protect third parties from dealing with the partnership under the mistaken assumption that the limited partner is a general partner with general liability. . . . A third party dealing with a corporation must reasonably rely on the solvency of the corporate entity. It makes little difference if the corporation is or is not the general partner in a limited partnership. In either instance, the third party cannot justifiably rely on the solvency of the individuals who own the corporation." (See also Feld, *The "Control" Test for Limited Partnerships* (1969) 82 Harv.L.Rev. 1471 1479.)

We agree with the views expressed in the *Frigidaire* case, and accordingly apply the principles there stated to the facts in the instant case. Such facts are: before the sublease was negotiated, Oken was aware of the corporate capacity of CRC, the general partner, and he knew that McCoy was one of its "principles." In June or July 1970 Oken asked Dick Browne, then the president of CRC, who would be representing CRC in its negotiations with plaintiff regarding the sublease. Browne replied that McCoy would be "making the decisions." McCoy signed the

sublease on behalf of Riverway, adding after his signature the words "for CRC." Moreover, the trial court found, as a fact, that "CRC was organized in good faith and had an adequate capitalization necessary to liquidate its indebtedness." Under these circumstances, no fraud or injustice to plaintiff results from respecting the corporate entity of the general partner. (See *Automotriz etc. De California* v. *Resnick* (1957) 47 Cal.2d 792, 796-797 [306 P.2d 1, 63 A.L.R.2d 1042].) We hold, therefore, that CRC, the corporate general partner, is solely liable for the obligations of the limited partnership under the sublease, and that McCoy, a limited partner, has no personal liability for such obligations.

Plaintiff requests an award of attorneys' fees on this appeal based upon the following provision of the sublease: ". . . in the event Lessor brings an action against Lessee to enforce any of the terms of this Lease . . . Lessee agrees to pay to Lessor a reasonable attorneys' fee . . . ." Under this provision plaintiff, the prevailing party herein as against defendant Riverway, is entitled to attorneys' fees even though the instant action on the sublease was commenced by plaintiff (lessee) rather than by Riverway (lessor). (See Civ. Code, § 1717; *Hunt* v. *Smyth* (1972) 25 Cal.App.3d 807, 832 [101 Cal.Rptr. 4].) Such a provisions covers fees on appeal (*Wilson* v. *Wilson* (1960) 54 Cal.2d 264, 272 [5 Cal.Rptr. 317, 352 P.2d 725]), which may be determined either by this court or by the trial court when it determines costs on appeal. (Code Civ. Proc., § 1034; *Genis* v. *Krasne* (1956) 47 Cal.2d 241, 248 [302 P.2d 289]; *Clejan* v. *Reisman* (1970) 5 Cal.App.3d 224, 241 [84 Cal.Rptr. 897].) The latter procedure is preferred in this case.

The judgment against defendant Riverway is affirmed. The judgment against defendant McCoy is reversed. Plaintiff shall recover its costs on appeal from defendant Riverway. Defendant McCoy shall recover his costs on appeal from plaintiff. The trial court is directed to fix reasonable attorneys' fees to be awarded plaintiff in connection with this appeal.

Files, P. J., and Jefferson (Bernard), J., concurred.

A petition for a rehearing was denied July 15, 1977, and the opinion and judgment were modified to read as printed above.