**MOUNT VERNON SAVINGS AND LOAN ASSOCIATION, et al.**

v.

**PARTRIDGE ASSOCIATES, et al.**

**Civ. No. JFM–83–176.**

United States District Court, D. Maryland.

Dec. 22, 1987.

Steven K. White, Squire, Sanders & Dempsey, Washington, D.C., for plaintiffs.

Christopher Sanger, Tucker, Flyer, Sanger & Lewis, Washington, D.C., Michael Schatzow, Melnicove, Kaufman, Weiner, Smouse & Garbis, Baltimore, Md., for defendants.

## MEMORANDUM

MOTZ, District Judge.

Plaintiff in this action is the Federal Savings and Loan Insurance Corporation ("FSLIC"), the receiver for the original plaintiff, Mount Vernon Savings and Loan Association, which has been declared insolvent. Defendants are Partridge Associates, a limited partnership, and American Housing, Inc. and MIW Investors of Washington ("MIW"), its general partner and one of its limited partners.[1] FSLIC asserts a contract claim against Partridge Associates for failing to pay for 2.6 million dollars of mortgages which FSLIC contends were turned over by Mount Vernon to Partridge Associates pursuant to a Memorandum of Understanding between them dated January 19, 1982. FSLIC seeks to hold MIW liable on this claim on the ground that MIW, although nominally a limited partner, took part in the control of the partnership's business.

Partridge Associates, American Housing and MIW have all filed counterclaims. Partridge Associates and American Housing allege that Mount Vernon breached a contract which it had made to provide permanent financing to Partridge Associates. MIW alleges that Mount Vernon committed fraud by representing to MIW that there was a balance outstanding on one of the mortgage loans transferred by Mount Vernon to Partridge Associates when, in fact, the loan had been paid off and Mount Vernon had wrongfully retained the proceeds. The parties have moved for summary judgment as to all of the claims which they have asserted against one another.[2]

---

1. Originally, FSLIC also asserted claims against Friendship Services, Inc. (the other limited partner of Partridge Associates) and Friendship Savings and Loan Association (the parent of Friendship Services). These claims (as well as claims asserted by FSLIC in a companion case against Fidelity and Deposit Company of Maryland, the surety on Mount Vernon's banker's bond) have been settled.

2. Initially, FSLIC also asserted claims for promissory estoppel and unjust enrichment, and Partridge Associates and American Housing assert-

## BACKGROUND

In 1971, MIW sold to one David Dreyfuss an apartment project in Columbia, Maryland known as Partridge Courts. As part of that transaction, MIW took a note from Dreyfuss in the amount of $4,826,000. Over the next ten years Dreyfuss paid off only $3,000 on the principal amount of the loan, and the note became an unproductive asset in MIW's portfolio. In 1981 MIW entered into an agreement with Dreyfuss whereunder MIW repurchased Partridge Courts by assuming the outstanding balance of $4,823,000 on the note and paying certain other consideration not relevant here.

MIW's plan was to convert Partridge Courts into a condominium complex. In October 1981 Partridge Associates was formed for that purpose. MIW was one of two limited partners and owned a 50% interest in the partnership; Friendship Services, Inc., a subsidiary of Friendship Savings and Loan Association, was the other limited partner and owned a 48% interest; American Housing was the general partner and owned a 2% interest. Only $2,000 in capital was contributed to Partridge Associates by the partners (in amounts proportionate to their respective shares).

MIW assigned to Partridge Associates its rights under the repurchase agreement with Dreyfuss. MIW also agreed to lend $6,000,000 to Partridge Associates. $4,823,000 of this loan was used by Partridge Associates to purchase from MIW the 1971 Dreyfuss note. The remainder of the loan proceeds were to be used to fund construction. The principal amount of the loan was to be repaid from release fees generated by the sale of the individual condominium units at Partridge Courts. The interest rate on the $6,000,000 loan was substantially greater than the interest rate had been on the 1971 Dreyfuss note, and MIW therefore contemplated that it would benefit from what was in effect the exchange of the two notes. The $6,000,000 loan was not to be secured by a deed of trust on Partridge Courts but by various negotiable home mortgage notes unrelated to Partridge Courts. Friendship Savings guaranteed to MIW that it would pledge $2,600,000 of such notes. Another $4,300,000 of such notes were obtained by Partridge Associates from Dominion Federal Savings and Loan Association in exchange for an assignment of the Dreyfuss note and its supporting deed of trust on Partridge Courts.

In late 1981, E. Mitchell Fry, Jr.—who with one Anthony Koones controlled the Friendship defendants and American Housing—approached James F. Russell, II, the president of Mount Vernon, about participating in the Partridge transaction. His purpose was to have Mount Vernon enter into an agreement with Partridge Associates similar to the $4,300,000 Dominion Federal transaction, whereby Partridge Associates would purchase $2,600,000 in negotiable residential mortgage notes from Mount Vernon. These notes were to replace the notes which Friendship had agreed to pledge to MIW.

For reasons which are not clear, Russell agreed to Fry's proposal.[3] On January 19, 1982, Fry, on behalf of American Housing, Partridge Associates and Friendship Services, and Russell, on behalf of Mount Vernon, signed a Memorandum of Under-

---

ed a claim for tortious interference with contract. These claims have now been abandoned.

**3.** Even if Mount Vernon had ultimately been paid for the mortgages which it turned over to Partridge Associates, the transaction did not make economic sense from Mount Vernon's point of view. The interest on its loan was simply to be the weighted average of the interest rates on the mortgages which were turned over by Mount Vernon to Partridge Associates. Moreover, although Friendship Services assigned to Mount Vernon a 50% interest in the profits (if any) which it was to receive from Partridge Associates, the financial structure of the Partridge project was such that it was highly unlikely that the limited partners would earn any such profits. It appears that what might have motivated Russell into signing the Memorandum of Understanding was that he needed Friendship Savings' participation in an unrelated deal to which Mount Vernon was committed in an amount beyond its lending authority under governing regulations. At approximately the same time, Mount Vernon made a below interest personal loan to Fry in the amount of $50,000.

standing under which Mount Vernon agreed to make a $2,600,000 loan to Partridge to be used for the purchase of 2.6 million dollars worth of residential mortgage loans. Two days later, Russell delivered to Fry mortgages in that face amount, and subsequently MIW agreed to accept these mortgages as substitute collateral for the similar Friendship notes.[4]

Mount Vernon was never paid a single penny for its mortgages, and no loan documents between Partridge Associates and Mount Vernon were ever executed. Subsequently, the Partridge transaction turned sour, and, in November 1982, MIW sent Partridge Associates a notice of default under the $6,000,000 loan. When MIW sought to foreclose upon the Mount Vernon notes, Mount Vernon instituted an action in the District of Columbia against Riggs National Bank (which was holding the notes as custodian), seeking an injunction to prevent their turnover to MIW. When Mount Vernon's motion for a preliminary injunction was denied, MIW foreclosed upon the notes. As a result, Mount Vernon suffered a $2,600,000 loss.

## DISCUSSION

*FSLIC's Claim Against Partridge Associates and American Housing*

FSLIC's claim against Partridge Associates and American Housing is based upon the January 19, 1982 Memorandum of Understanding. That Memorandum provided as follows:

> Partridge Associates, a Maryland Limited Partnership ("Partridge") and Mount Vernon Savings and Loan Association, a Virginia Corporation ("Mt. Vernon") agree as follows:
>
> 1. Mt. Vernon shall make a $2,600,-000.00 three year interest only loan (the "Loan") to Partridge with an interest rate to be equivalent to the weighted yield of the mortgages (as defined below).

> 2. Partridge shall use the Loan proceeds to buy $2,600,000.00 worth of mortgage or deed of trust notes secured by first priority mortgages or deeds of trust on residential real estate (the "Mortgages").
>
> 3. In order to secure the Loan, Partridge agrees to grant Mt. Vernon a deed of trust on the 216 unit apartment/condominium project located in Howard County and known as Partridge Courts (the "Premises"). This deed of trust shall be subordinate to any acquisition/construction/conversion loan, secured loans by MIW and Friendship, seller financing (Dreyfuss) and a 1971 Dreyfuss note to MIW in the approximate principal balance of $4,823,000.00.
>
> 4. In consideration of Mt. Vernon making the above Loan to Partridge, Friendship Services, Inc. ("Friendship") agrees to assign to Mt. Vernon a fifty (50%) percent participation in the profits to be received, if any, by Friendship in Partridge.
>
> 5. Partridge and Mt. Vernon shall promptly enter into a loan agreement and security agreement, in form and substance satisfactory to the parties and their respective counsel, embodying the above terms, 1–3.
>
> 6. Friendship shall enter into an assignment agreement, in form and substance satisfactory to Friendship, Mt. Vernon, and their respective counsel, embodying the above terms set forth in No. 4.
>
> 7. The parties to enter into, no later than January 22, 1982, the above agreement.
>
> 8. This memorandum shall be binding upon the parties hereto and their successors and assigns.

Partridge Associates and American Housing contend that the Memorandum of Understanding was no more than an agreement to agree and, as such, was unenforceable. In support of this argument, they

---

**4.** MIW accepted the Mount Vernon mortgages as substitute collateral in two stages. It accepted the first half of the mortgages almost immediately upon their tender in January, 1982; it did not accept the second half of them (which were on properties outside of Maryland) until July, 1982. The paid-off note which is the subject of MIW's counterclaim, *see infra,* was among the second half of the mortgages.

rely upon *Grooms v. Williams,* 227 Md. 165, 175 A.2d 575 (1961), *Helferstay v. Creamer,* 58 Md.App. 263, 473 A.2d 47 (1984), and *First National Bank of Maryland v. Burton, Parsons Co.,* 57 Md.App. 437, 470 A.2d 822, *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984).

The cases cited by defendants do indicate that courts will not order the parties to negotiate under an agreement to agree or convert into a binding contract what is in reality no more than an agreement to agree by adding a critical contract term which has been left unresolved by the parties. These cases might be controlling here if this case were simply one in which the parties had entered into the Memorandum of Understanding, and one of them thereafter had sought specifically to enforce it. That is not all that is involved, however. What Partridge Associates and American Housing ignore is that, after the Memorandum of Understanding was executed, Russell delivered to Fry 2.6 million dollars worth of mortgages for which Mount Vernon was never paid and which Partridge Associates used as security for its loan from MIW. These facts clearly differentiate the present case from *Grooms, Helferstay* and *First National Bank.*

Defendants also make several subsidiary arguments. First, they contend that loan documentation submitted to Mount Vernon by counsel for Partridge Associates after the Memorandum of Understanding was executed (as well as similar earlier proposed documentation) indicate that Mount Vernon's pledge of collateral to Partridge Associates was intended to be without recourse. Second, they assert that FSLIC is not entitled to any restitutionary remedies against Partridge Associates and American Housing because it was Friendship Savings (for whose mortgages the Mount Vernon mortgages were substituted as collateral) which reaped the benefits of the transaction. Third, they suggest that FSLIC's claim should be reduced by $1,200,000 on the ground that if Mount Vernon had arranged for the execution and filing of the deed of trust proposed to it by Partridge Associates after the Memorandum of Understanding was executed, it would have been able to foreclose upon that deed of trust and recover $1,200,000 (the amount which Dominion Federal eventually recovered by way of foreclosure when the Partridge project failed.) All of these contentions raise disputed matters of fact. Therefore, whatever their merits may be, they cannot be resolved short of trial.[5]

*FSLIC'S Claim Against MIW*

FSLIC contends that MIW has unlimited liability for Partridge Associates' obligations because MIW took part in the control of the business of the partnership. Theoretically, a threshold question is presented whether this case is governed by the "old" Uniform Limited Partnership Act, which was in effect in Maryland when

---

**5.** Partridge Associates and American Housing also argue that FSLIC should be judicially estopped from asserting in this action that the Mount Vernon mortgages were tendered pursuant to the Memorandum of Understanding because Mount Vernon, through Russell, had asserted in the injunction action filed in the District of Columbia in 1982 that the turnover of the mortgages had nothing to do with the Partridge transaction. The purpose of the doctrine of judicial estoppel—which has been accepted in the Fourth Circuit, *see Allen v. Zurich Insurance Co.,* 667 F.2d 1162, 1166 (4th Cir.1982); *but see United States v. 49.01 Acres of Land,* 802 F.2d 387, 390 (10th Cir.1986); *Konstantinidis v. Chen,* 626 F.2d 933, 938 (D.C.Cir.1980)—is to prevent a litigant from "playing fast and loose with the courts." This purpose would not be served by invoking the doctrine here since FSLIC is acting in complete good faith in pursuing this action. *Cf. FDIC v. Gulf Life Insurance Co.,* 737 F.2d 1513, 1518 (11th Cir.1984). Furthermore, the majority of jurisdictions which do recognize the doctrine do not apply it unless the party has been successful in the first action in persuading a court to accept its position. *See, e.g., Moore v. United Services Automobile Association,* 808 F.2d 1147, 1153 n. 6 (5th Cir.1987); *Edwards v. Aetna Life Insurance Co.,* 690 F.2d 595, 599 (6th Cir.1982).

MIW makes a related contention that Russell's testimony in the District of Columbia action constituted a "fraud on the court," and that FSLIC should be barred by that fraud from asserting its claims in this action. MIW does not seek an evidentiary hearing on that issue, and this Court is fully satisfied that, although Russell's testimony in the District of Columbia may have been perjured, no "fraud on the court" has been shown for which FSLIC should be held responsible.

Partridge Associates was formed and which governed Partridge Associates at the time of the occurrence of the events giving rise to this action, or under the "new" Revised Uniform Limited Partnership Act, which became applicable to partnerships formed under the old Act on July 1, 1985. *See* Md. Corps. & Ass'ns Code Ann., Section 10–1104(2) (Michie Supp.1987). However, this Court believes that insofar as the statutory provisions here involved are concerned, the new Act merely clarifies what was inchoate in the old. Therefore, this threshold question need not be resolved.

Section 7 of the old Act (codified at Md. Corps. & Ass'ns Code Ann., Section 10–106(b)(1)(1975)) provided as follows:

> A limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business.

Some courts held that, under this section, a limited partner could not be held liable as a general partner unless he had led the plaintiff to believe that he was a general partner. *See, e.g., Western Camps, Inc. v. Riverway Ranch Enterprises,* 70 Cal.App. 3d 714, 138 Cal.Rptr. 918 (1977); *Outlet Co. v. Wade,* 377 So.2d 722 (Fla.Dist.Ct. App.1979); *Frigidaire Sales Corp. v. Union Properties, Inc.,* 88 Wash.2d 400, 562 P.2d 244 (1977) (en banc). These cases drew support from an official comment to Section 1 of the old Act that "no public policy requires a person who contributes to the capital of a business ... to become bound for the obligations of the business; provided creditors have no reason to believe that the times their credits were extended that such person was so bound." At least one other court held, however, that reliance by the plaintiff was not an element of control under the old Act. *See Delaney v. Fidelity Lease Ltd.,* 526 S.W.2d 543, 545 (Tex.1975). *See generally* Comment, *Limited Partner Control and Liability under the Revised Uniform Limited Partnership Act,* 32 Sw. L.J. 1301 (1979).

Although undoubtedly in conflict with one another, these two dichotomous lines of authority can be explained by recognizing that the different courts had different focuses. Those which required reliance as an element of control were concentrating upon the external relationship between the plaintiff and the limited partner, and were concerned with the equities arising from that relationship. The *Delaney* Court, in contrast, appears to have been concerned about the broader public policy of requiring those who choose to accept the benefits of the limited partnership form to preserve the integrity of the partnership's internal relationships. This distinction is made explicit in the new Act. Under Section 303(a) (codified in Maryland as Section 10–303(a)), a limited partner who disregards the limited partnership form to such an extent that he becomes substantially the same as a general partner has unlimited liability regardless of a plaintiff's knowledge of his role. At the same time, a limited partner may have unlimited liability for exercising less than a general partner's power if the fact that he acted as more than a limited partner was actually known to the plaintiff.

█ Against this background it is too facile simply to say that "control" is a question of fact which must be resolved by the fact-finder. *But cf. Micheli Contracting Corp. v. Fairwood Associates,* 68 A.D. 2d 460, 418 N.Y.S.2d 164 (1979). Such an approach begs the question of what "control" means. Rather, analysis must first proceed by asking whether Mount Vernon had actual knowledge that MIW was acting as something more than a limited partner. FSLIC has presented no evidence to prove that fact. There is no indication whatsoever that Russell was led into the Partridge transaction by knowledge of MIW's participation in the partnership, and Donald Eversoll, the then chairman of the Board of Mount Vernon, has testified that he did not learn of the Partridge transaction until November, 1982, long after Mount Vernon had entered the Memorandum of Understanding and turned over the mortgages. Furthermore, the documents promoting the Partridge venture to which FSLIC points as mentioning MIW's participation clearly identify MIW as a limited partner.

■ Therefore, it must then be asked, as phrased in the new Act, whether MIW's "participation in the control of ... [Partridge Associates] ... was substantially the same as the exercise of the powers of a general partner." As to this question, FSLIC properly maintains that the record is clear that MIW originated the basic concept of Partridge Associates in order to breathe life into a dormant loan. Further, the affidavit of Michael J. Ferraguto, Jr., the president of an American Housing subsidiary which did construction for the Partridge project, does establish that MIW's president attended and participated in periodic operational meetings concerning the progress of the project.[6] However, the law does not confine the role of a limited partner to that of a passive investor, as in a conventional syndication. To the contrary, as is expressly recognized in the new Act, *see* Md. Corps. & Ass'ns Code Ann., Section 10–303(b)(1985), and as was implicit in the old, *see Silvola v. Rowlett,* 129 Colo. 522, 272 P.2d 287 (1954) (en banc), a limited partner may be actively involved in the day to day operation of the partnership's affairs, provided that he does not have ultimate decision making responsibility. Thus,

the question is not whether MIW provided advice and counsel to Partridge Associates (which, undoubtedly, it did in light of its long association with the Partridge project) but whether it exercised at least an equal voice in making partnership decisions so as, in effect, to be a general partner. On that issue FSLIC has presented no evidence, and summary judgment against it is therefore proper.[7]

### Counterclaim of Partridge Associates and American Housing Against FSLIC

Partridge Associates and American Housing have filed a counterclaim against FSLIC on the ground that Russell, on behalf of Mount Vernon, agreed to provide end-loan financing for the Partridge Project and that Mount Vernon failed to perform this promise. Partridge Associates and American Housing have provided no discovery on the counterclaim. Koones, Fry and several other persons associated with the partnership have asserted their constitutional privilege against self-incrimination in refusing to respond to deposition questions, and Partridge Associates and American Housing have taken the position

6. Without the request or approval of the Court, FSLIC submitted after the summary judgment motions hearing a "Post–Hearing Memorandum Concerning The Control Test For Limited Partner Liability." Attached to this memorandum was an affidavit signed by one of FSLIC's counsel stating that Ferraguto was reluctant to provide any information about MIW's participation in Partridge Associates because "he was concerned about offending Mr. Savage [the president of MIW] whom he believed to be an influential lender in the Washington market and in a position to hinder Mr. Ferraguto's professional interests." MIW has filed a motion to strike the memorandum and affidavit. The motion is granted. It comes with ill grace for FSLIC to contend that it cannot produce an affidavit sufficient to withstand a motion for summary judgment filed against it by MIW when it is aggressively contending that it is entitled to summary judgment as to Partridge Associates' and American Housing's counterclaim because of their present inability to produce testimony to support their allegations. That aside, the practice of submitting unsolicited post-hearing memoranda and affidavits cannot be tolerated. Fed. R.Civ.P. 56 contemplates a complete record having been established by the time that a summary judgment motion hearing is held, and this Court follows the practice of preparing its opinions

promptly on the basis of the record as it has been established. That practice—which is necessary in order for the Court to meet the demands of its docket—would be undermined if parties were permitted to submit memoranda and affidavits at a time of their own choosing. In any event, FSLIC still has failed to present any evidence legally sufficient to support a finding that MIW acted substantially as a general partner in Partridge Associates.

7. Although not directly on point, the law relating to "piercing the corporate veil" is analogous. Maryland law on that score is quite strict, permitting the veil to be pierced only to prevent fraud or enforce a paramount equity. *See, e.g., Bart Arconti & Sons, Inc. v. Ames–Ennis, Inc.,* 275 Md. 295, 310, 340 A.2d 225, 234 (1975); *Damazo v. Wahby,* 259 Md. 627, 633, 270 A.2d 814, 817 (1970). Here, FSLIC alleges no fraud against MIW, and no paramount equity exists in favor of FSLIC vis-a-vis MIW. For, although Mount Vernon did lose its 2.6 million dollars worth of mortgages, MIW itself was not unjustly enriched by its receipt of those mortgages from Partridge Associates since they simply provided substitute collateral for other security which MIW had previously held on its loan to Partridge Associates.

that they cannot answer interrogatories because Koones and Fry will not provide the information necessary to do so. Accordingly, FSLIC has moved for summary judgment on the ground that Partridge Associates and American Housing have not and cannot provide sufficient facts to substantiate their claim. *See generally Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).[8]

██ Although there is authority to the contrary, *see, e.g., Justice v. Laudermilch,* 78 F.R.D. 201 (M.D.Pa.1978); 8 C. Wright & A. Miller, *Federal Practice and Procedure* Section 2018, at 145 (1970), it is well established that it is proper to dismiss the claim of a plaintiff who exercises his privilege against self-incrimination to refuse to answer questions related to the issues involved in the litigation which he has instituted. *See, e.g., Hiley v. United States,* 807 F.2d 623, 628 (7th Cir.1986); *Lyons v. Johnson,* 415 F.2d 540, 542 (9th Cir.1969), *cert. denied,* 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970); *Brown v. Ames,* 346 F.Supp. 1176, 1177–78 (D.Minn.1972); *Kisting v. Westchester Fire Insurance Co.,* 290 F.Supp. 141, 149 (W.D.Wis.1968), *aff'd,* 416 F.2d 967 (7th Cir.1969). This rule has been extended to a counterclaiming defendant. *See Stop and Shop Companies, Inc. v. Interstate Cigar Co.,* 110 F.R.D. 105, 108 (D.Mass.1986). This extension is quite proper. A person who alleges that he has been defrauded and who institutes a suit to be made whole should not be required to face the peril of having counterclaims asserted against which he cannot adequately prepare his defense.

██ It is premature to grant FSLIC the summary judgment which it seeks, however. This case is presently set for trial in February, 1988. If the trial goes ahead as scheduled, as part of the pretrial order, this Court will, in all probability, rule that summary judgment be granted as to the Partridge Associates' and American Housing's counterclaim. However, the case may not be reached for trial in February, either because FSLIC appeals this Court's granting of summary judgment to MIW on FSLIC's claim against it or because of the intervention of criminal cases which must be tried under the Speedy Trial Act. In that event, resolution of FSLIC's motion as to the counterclaim should be postponed until a reasonable period before the rescheduled trial date in order to determine if, by that time, the witnesses who have thus far invoked their privilege against self-incrimination have changed their position and answered the questions put to them.[9]

### MIW's Counterclaim Against FSLIC

MIW has asserted a counterclaim for fraud. This counterclaim arises from the fact that, prior to the time that MIW accepted the second half of Mount Vernon's mortgages as substitute collateral for the comparable mortgages theretofore pledged by Friendship, one of the mortgages (in the face amount of $67,500) had been paid off and the mortgage released by Mount Vernon. MIW alleges that, after its acceptance of the Mount Vernon mortgages, Mount Vernon misrepresented to it that the mortgage was still outstanding and that, as a consequence, MIW did not obtain substitute collateral for that note as it was entitled to do under its agreement with Partridge Associates.

---

**8.** FSLIC has also moved to dismiss the counterclaim as a sanction under Fed.R.Civ.P. 37 for failure to provide discovery. This motion is not yet technically ripe for consideration under this Court's Local Rules. In any event, the reason for Partridge Associates' and American Housing's non-compliance with discovery requests is the assertion by their principals of their privilege against self-incrimination. It is therefore on that basis that the issues must be analyzed.

**9.** Partridge Associates and American Housing also attempt to fend off summary judgment on their counterclaim by use of several excerpts from earlier testimony by Koones, Fry and Russell, given in connection with the District of Columbia injunction action. This proffered evidence appears to be insufficient to establish the oral contract alleged by Partridge Associates and American Housing with any reasonable degree of certainty. *See, e.g., Strickler Engineering Corp. v. Seminar, Inc.,* 210 Md. 93, 122 A.2d 563 (1956). However, ruling upon this issue will likewise be deferred.

The record as it has been established for summary judgment makes it clear that MIW cannot prevail on its counterclaim for two fundamental reasons.

■ First, no misrepresentation was made by Mount Vernon to MIW. The statements upon which MIW relies were a series of responses made by Karen Reynolds, a young mortgage servicing clerk for Mount Vernon, to inquiries sent to Mount Vernon by MIW (after its acceptance of the Mount Vernon mortgages) as to the status of the outstanding balances on the mortgage loans. When responding to the first of these inquiries, Ms. Reynolds could not find the mortgage in question. Therefore, she wrote on the form sent to her by MIW "$67,550.00 (guess) can not find" on the entry next to the mortgage in question. In response to the next two inquiries, she reduced the outstanding balance by $100.00 each time, but she again wrote the word "guess" next to her entry. These responses were true, not misrepresentations.

■ Second, although MIW speculates that Ms. Reynolds was told to make these responses to MIW pursuant to a plan developed by Mount Vernon management to hide the fact that the mortgage had been paid off and released, the record is devoid of any facts to support that speculation. To the contrary, Ms. Reynolds has submitted an uncontradicted affidavit that no one instructed her how to fill out the forms and that she did so simply as a matter of routine. Further, she states unqualifiedly that no one asked her to conceal anything from MIW or to represent information on the forms in any particular manner. The deposition testimony of Peter Von Pawel, Mount Vernon's executive vice president, who MIW apparently alleges was behind the concealment scene, confirms Ms. Reynolds' affidavit. Von Pawel testified that he told Ms. Reynolds that he did not want her to spend any of her time filling out the forms since Mount Vernon was under no duty at all to respond to MIW's inquiries.

A separate order effecting the rulings made in this memorandum is being entered herewith. The summary judgments being entered in favor of MIW on FSLIC's claim against it and in favor of FSLIC on MIW's counterclaim will be made final pursuant to Fed.R.Civ.P. 54(b).[10]

### ORDER

For the reasons stated in the memorandum entered herein, it is this 22nd day of December 1987

ORDERED

1. The motion for summary judgment filed by Partridge Associates and American Housing, Inc. as to the claim asserted against them by the Federal Savings and Loan Insurance Corporation (FSLIC) is denied;

2. The motion for summary judgment filed by MIW Investors of Washington (MIW), presently known as Ameribanc Investors Group, as to the claim asserted against it by FSLIC is granted;

3. Ruling upon the motion for summary judgment filed by FSLIC as to the counterclaim asserted by Partridge Associates and American Housing, Inc. is deferred; and

4. The motion for summary judgment filed by FSLIC as to the counterclaim asserted by MIW is granted.

IT IS FURTHER ORDERED that this Court, expressly determining pursuant to *Fed.R.Civ.P.* 54(b) that there is no just reason for delay, directs the entry of final judgment in favor of MIW against FSLIC on the claim asserted by FSLIC against MIW and in favor of FSLIC against MIW

---

**10.** There is no just reason for delay in entering final judgment on these claims. This is particularly so since FSLIC's counsel has indicated that if FSLIC prevails at trial against Partridge Associates and American Housing and then successfully argues on appeal that MIW should be held liable as a partner in control of Partridge Associates, FSLIC may well take the position that MIW is bound by the judgment against Partridge Associates as a privy in interest. Under these circumstances, unless final judgment is now entered on FSLIC's claim against MIW (and, in the event of an appeal, unless the trial is postponed), MIW may well have to incur the expense of participating in the trial despite the fact that summary judgment has been entered in its favor.

on the counterclaim asserted by MIW against FSLIC.