584 A.2d 1301

**EASTERN SAVINGS BANK, F.S.B.**

v.

**Frank A. NARDO, et ux.**

**No. 11, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Jan. 31, 1991.

Francis J. Gorman (Thomas Hoxie, Semmes, Bowen & Semmes, on the brief), Baltimore, for appellant.

Robert K. Parker (Michael Ritchey and Dulany, Parker & Scott, on the brief), Westminster, for appellees.

Argued before MOYLAN and BLOOM, JJ., and JAMES S. GETTY (Judge Retired Specially Assigned).

BLOOM, Judge.

This case involves a dispute as to how much money appellees, Frank A. Nardo and June Nardo, his wife, owe appellant, Eastern Savings Bank, F.S.B., as a loan commitment fee. The bank contends that the Nardos owe the full amount of a cognovit note for $60,000 which they gave the bank, together with $7,000 in cash, as a non-refundable fee; the Nardos contend that under an applicable provision of the agreement between the parties they were obligated to pay a commitment fee of only $14,000, plus certain costs and attorney's fees.

The case began with the bank obtaining a judgment by confession in the Circuit Court for Baltimore County against the Nardos for $60,000, the full amount of the cognovit note. On motion timely made, the court struck out the judgment by confession. Thereafter, each side moved for summary judgment based upon its own interpretation of the loan commitment agreement. The court ruled in favor of the Nardos, granting their motion for summary judgment and denying the bank's motion for summary judgment.

We agree with appellant's contention that the court erred in granting appellees' summary judgment motion but not

with its contention that its own motion should have been granted instead.

## Facts

The Nardos wished to obtain a loan from appellant, in the amount of $6,700,000.00. The loan was to be secured by a mortgage or deed of trust on the Englar Shopping Center, which was owned by appellees. On 19 October 1987, the Nardos entered into a loan commitment agreement with appellant.

Of the 30 provisions contained in the loan commitment, ¶s 6, 13(k), 21, 22 and 23 are germane to the issues presented on appeal. Pursuant to ¶ 6,[1] the Nardos were required to pay a non-refundable commitment fee of $67,000.00. They chose to pay $7,000.00 in cash and $60,000.00 in the form of a promissory note, payable at the maturity date.[2]

The $67,000.00 commitment fee was non-refundable except as provided for in ¶ 22 of the loan commitment. Ac-

---

1. Paragraph 6 is as follows:

   Commitment Fee: In consideration of its commitment to make the Loan in the aforementioned amount, Eastern shall receive a commitment fee of two percent (2%) of the funds committed to the Loan, of which $7,000.00 has been paid in cash and $60,000.00 is represented by a note of Borrower to Eastern, dated September 15, 1987, payable in full at settlement (all of which $67,000.00 is non-refundable (except as provided in ¶ 22 hereof)), and the balance (together with the note) will be payable at the time of settlement.

2. According to the Promissory Note, "Maturity Date" was defined as "the earlier to occur of (i) the expiration, due to the failure or refusal of Maker to accept the same within the time and in the manner therein provided, of the written commitment (hereinafter called the Commitment) from Payee, duly issued and delivered, to lend to Maker the use of Seven Million Dollars ($7,000,000.00) in connection with that certain parcel of land owned by Maker located in Carroll County, Maryland, together with improvements thereon consisting of approximately 134,000 square feet of retail space more commonly known as Englar Center, which Commitment contains terms and conditions substantially similar to those set forth in that certain loan application of even date herewith submitted by Maker to Payee, (ii) the occurrence of any event of default by Maker under the Commitment, which default by Maker terminates Payee's obligation to fund the loan, or

cording to that paragraph,[3] if appellees found any terms of the proposed loan documents, as defined in ¶ 21,[4] unacceptable, and therefore declined to proceed with the loan, they were then obligated to pay a reduced commitment fee of $14,000.00 plus costs and attorney's fees pursuant to ¶ 23.[5]

Paragraph 13 of the loan commitment, entitled "Pre–Settlement Conditions and Approvals" listed fourteen items that were to be provided to appellant no later than five banking days prior to closing. The relevant portion of ¶ 13 reads as follows:

> 13. Pre–Settlement Conditions and Approvals: No later than five (5) banking days prior to closing, you will

---

(iii) the date of funding of the loan made by Payee to Maker pursuant to the Commitment."

**3.** The relevant portion of ¶ 22 reads as follows:
In the event the terms of the proposed loan documents are not acceptable to Borrower, Eastern shall be entitled to retain out of the commitment fee the sum of $14,000.00. In addition, Borrower shall pay all of Eastern's counsel fees and other costs described in paragraph 23 hereof. In the event the loan documents are not acceptable .to Borrower, the $60,000 note executed by Borrower at the time of application for the Loan shall be cancelled in consideration of the payment by Borrower to Eastern of all remaining sums due to Eastern and its counsel pursuant to the terms of this subparagraph.

**4.** Paragraph 21 defined loan documentation to include "without limitation, the following aforementioned documents: (f) [i]f the Subject Property is leasehold, copies of all certificates, estoppels, consents and agreements of Landlord as may be required of Eastern."

**5.** Paragraph 23 reads as follows:
Costs: All costs involved in the loan transactions, including but not limited to, titled examination, title insurance premiums, appraisals, credit reports, surveys, documentary stamps, recording costs, transfer taxes, and Eastern's counsel fees will be borne by you and the Loan shall be cost free to Eastern. Such costs and expenses, to the extent actually incurred, shall be paid by you, independent of whether closing actually occurs. In addition, the loan documents will provide that upon any default, you shall be liable to Eastern for all expenses and costs, including attorneys' fees, incurred by Eastern as a result of the default.

submit to Eastern and Eastern must have approved the following:

(k) Estoppel Certificates [6] executed by each tenant of the Subject Property stating (i) that the lease of the tenant is unmodified and in full force and effect, (ii) that there are no defaults under the lease, and (iii) the date through which rent has been paid and the amount of any security deposit and any interest due thereon. The estoppel certificate shall acknowledge Eastern's reliance upon it.

Appellees were then instructed, pursuant to the loan commitment, that if they wished to proceed with the loan, closing would take place by 31 October 1987. At the closing, on 30 October 1987, the Nardos informed Eastern that they were unable to procure an estoppel certificate from K–Mart due to several disputes between the parties. Nine hours later, still unable to reach an agreement, the Nardos chose to withdraw from negotiations, citing unacceptable terms.

According to the Nardos, they owe Eastern $14,000.00 (of which $7,000 has already been paid) plus attorney's fees pursuant to ¶ 22 of the loan commitment. Appellant, however, claims that appellees breached the terms of the Commitment Loan by their failure to provide the certificate of estoppel, thereby triggering the maturity date of the promissory note, and now owe the full $67,000.00 commitment fee.

In granting appellees' motion and denying appellant's motion for summary judgment, the trial court concluded that ¶ 22 was clear on its face, stating, "They [Nardos] don't have the estoppel certificates and therefore the provision in the commitment letter saying that they had to have the estoppel certificates is unacceptable to them." Thus,

---

**6.** The purpose for the estoppel certificates is to have a tenant confirm to a lender that rent will be paid to the owner-borrower and to have the tenant acknowledge the lender's reliance on the cash flow provided by the rent payments.

the court ruled, appellees could withdraw from negotiations and pay a total of $14,000.00 plus costs and attorney's fees because they found one of the terms of the proposed loan documents unacceptable. Granting appellees' oral motion for summary judgment, the court determined their liability, under ¶ 22 to be a $14,000 fee (less the $7,000 previously advanced) plus costs and attorney's fees in the amount of $9,337.01.

Appellant contends that summary judgment in favor of appellees was inappropriate due to appellees' breach of the loan commitment as well as factual disputes concerning whether or not appellees had refused to negotiate in good faith, whether or not there were any unacceptable terms in the proposed loan documents, and whether the commitment fee was $14,000.00 or $67,000.00.

## *Discussion*

■ The Court of Appeals summarized the standard for granting summary judgment as follows. "If there is a genuine dispute as to any material fact, then it should not be granted. In reviewing such a motion we must be concerned primarily with deciding whether or not a factual issue exists. Therefore, all inferences should be resolved against the party making the motion. However, when the moving party has set forth sufficient grounds for summary judgment, the party opposing the motion must show with some precision that there is a genuine dispute as to material fact." *Rooney v. Statewide Plumbing,* 265 Md. 559, 563, 290 A.2d 496 (1972). Facts are material if their resolution will affect the outcome of the case. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985).

■ Our concern in reviewing the propriety of the trial court's action in granting appellees' motion is whether there was a dispute as to a material fact and, if not, whether the moving party was entitled to judgment as a matter of law. *Mayor & City Council of Baltimore v. Fidelity and De-*

*posit Co. of Maryland,* 282 Md. 431, 446, 386 A.2d 749 (1978).

## I

█ In the case *sub judice,* appellant's first assertion concerns whether the circuit court erred in granting summary judgment in favor of appellees thereby allowing appellees to avoid their promise to pay the $67,000.00 commitment fee. Appellant cites *Goldman v. Connecticut General Life Insurance Company,* 251 Md. 575, 248 A.2d 154 (1968), for the correct proposition that a commitment fee constitutes consideration for a lender's commitment and is not liquidated damages, penalty, or guaranty, and may not be recovered by a borrower upon the borrower's decision not to take out the loan. In *Goldman,* the court concluded that, according to the contract, "the fee would be refunded when the loan was closed, but neither made reference to the disposition to be made of the fee if the transaction was never consummated ...". *Id.* at 580, 248 A.2d 154.

Unlike *Goldman,* the case at bar does not turn on the nature of the $67,000.00 fee. Both parties agree that the $67,000.00 was a commitment fee in consideration of Eastern's holding itself ready and willing to fund a $6,700,000.00 loan. Also, unlike *Goldman,* the contract in the case *sub judice* made reference to certain conditions under which the transaction might not be consummated, and to the disposition of the fee in that event.

As noted, *supra,* ¶ 22 specifically provides that if the Nardos deemed the loan documents to be unacceptable, the $60,000 note would be canceled in consideration of the payment of an additional $7,000 (for a total commitment fee of $14,000) plus counsel fees and other costs as set forth in ¶ 23.

According to the Court of Appeals, "[u]nder the objective law of contracts, a court, in construing an agreement, must first determine from the language of the agreement itself, what a reasonable person in the position of the parties

would have meant at the time it was effectuated." *Aetna Cas. and Sur. v. Ins. Comm'r,* 293 Md. 409, 420, 445 A.2d 14 (1982). Appellant suggests that the language of ¶ 22 was inserted in the agreement because the Nardos had not previously done business with Eastern, therefore, they requested a provision in the loan commitment that would limit their liability on the commitment fee to $14,000 if the terms of the proposed loan documents were not acceptable.

For a definition of loan documentation we are directed to ¶ 21 wherein subparagraph (f) includes, *inter alia,* estoppel certificates. Appellant is correct in asserting that "[i]t was unreasonable for the Nardos to object to the fundamental requirement to have estoppel certificates *as part of the loan documentation ....*" The fact is that the production of an estoppel certificate was a pre-settlement condition, as outlined in ¶ 13(k) of the loan commitment. The loan commitment itself was not part of the proposed loan documents and therefore the requirement that the Nardos produce estoppel certificates may not be reviewed for acceptability after the loan commitment has been executed. The court erred, therefore, in ruling that the unacceptable term was the requirement of an estoppel certificate. Once the Nardos entered into the loan commitment they agreed to produce estoppel certificates by virtue of ¶ 13(k). Paragraph 22 gave appellees the right to object to the *form or content* of the certificates, not the requirement that they be produced.

We hold, therefore, that the circuit court misinterpreted the loan commitment as a matter of law by finding that appellees were free to reject the requirement that they produce an estoppel certificate on the basis that the requirement was no longer acceptable.

## II

Several months after the closing should have taken place appellees provided appellant with eight written objections to

the proposed loan documentation, wherein they stated *inter alia,*

> III.  Estoppel Certificate—The estoppel certificate form required by Eastern does not conform to ¶ 13k of the commitment letter.  It goes far beyond the scope of the sub-paragraph (k).  We communicated to Eastern our concern with the form they were requiring and suggested that major tenants would probably decline signing it.

Appellant asserts that "the provision in the loan commitment reducing the commitment fee in the event the terms of the proposed loan documents were not acceptable to the Nardos should be interpreted on an objective, reasonable basis, rather than on the basis of a subjective, unilateral decision by the Nardos."  Appellant also asserts that "even assuming there was something unacceptable in the terms of the proposed loan documents, Eastern was willing to negotiate with the Nardos to reach accommodations and agreement.  The Nardos were likewise obligated to negotiate in good faith which they failed to do."  We will treat both issues as one.

We believe that *Julian v. Christopher,* 320 Md. 1, 575 A.2d 735 (1990), is helpful in our analysis of this issue.  In *Julian,* the Court held that the law imposes "a standard of reasonableness on a landlord in withholding consent to a sublease unless the lease expressly states otherwise."  *Id.* at 6, 575 A.2d 735 (quoting *Campbell v. Westdahl,* 148 Ariz. 432, 715 P.2d 288 (1985)).  *Julian* expressly overruled *Jacobs v. Klawans,* 225 Md. 147, 169 A.2d 677 (1961), in which the Court held that "when a lease contained a 'silent consent' clause prohibiting a tenant from subletting or assigning without the consent of the landlord, landlords had a right to withhold their consent to a subletting or assignment even though the withholding of consent was arbitrary and unreasonable."  *Julian v. Christopher,* 320 Md. at 3, 575 A.2d 735.

The Court enunciated two public policy reasons for changing the law of *Klawans.*  The second is applicable to our

discussion in the case *sub judice*. It is the public policy which implies a covenant of good faith and fair dealing in every contract. *Id.* at 8, 575 A.2d 735. The Court went on to say that "this Court has recognized that in a lease, as well as in other contracts, 'there exists an implied covenant that each of the parties thereto will act in good faith and deal fairly with the others.'" *Id.* at 9, 575 A.2d 735 (quoting *Food Fair v. Blumberg,* 234 Md. 521, 534, 200 A.2d 166 (1964)).

We are well aware that the ruling in *Julian* was held to be prospective and that the case *sub judice* preceded that decision. We are not, however, faced with the same concerns as was the Court in *Julian,* which was a prior decision upholding the right of a landlord to act unreasonably and arbitrarily in refusing to permit his tenant to sublet the demised premises or assign the lease. The relationship between these parties is not that of landlord and tenant, and there is no precedent approving arbitrary, capricious, or unreasonable conduct in a transaction similar to the one at issue in this case.

In *Helferstay v. Creamer,* 58 Md.App. 263, 473 A.2d 47 (1984), the contract contained a provision stating that the parties agreed to enter into 'good faith settlement negotiations.' This Court found that although in most instances agreements to negotiate in good faith have been held to be unenforceable because of vagueness, *id.* at 274, 473 A.2d 47 (citations omitted), the requirement of bargaining in good faith was well-defined and well-understood in the field of labor law. *Id.* Citing *Montgomery County Council of Services Employees, Inc. v. Board of Education of Montgomery County,* 277 Md. 343, 349–50, 354 A.2d 781 (1976), the Court stated:

> The requirement of good faith is a subjective measure which can be applied only in light of the totality of the circumstances. It is not required that the parties reach agreement; nor is it even necessary that concessions be made. [Citations omitted]. Somewhat paradoxically, perhaps, the cases suggest that a "desire to reach agree-

ment" constitutes good faith bargaining, and conversely that a "desire not to reach an agreement" is bad faith; condemned is a "predetermined resolve not to budge from an initial position," and required is "a serious attempt to resolve differences and reach a common ground." (Citations omitted.) ... The task in applying the good faith standard is to distinguish, upon the facts of each case, between a party genuinely participating in negotiations, listening to and evaluating proposals made by the other side and attempting to explain its own position, with a willingness to persuade and be persuaded, and a party merely "going through the motions" with a "predetermined resolve not to budge from an initial position." (Citations omitted.)

In discussing whether a party in *Helferstay, supra,* had negotiated in good faith, we stated:

The trial judge had before him Miller's extensive testimony in the 1979 hearing. Miller testified again in the 1982 hearing and the court advised that he had re-read the 1979 testimony. The judge had the benefit of observing Miller's demeanor as a witness on both occasions. The crucial decision required of the court was the evaluation of the witness Miller's credibility. Judge Ross found as a fact that Miller had negotiated in good faith.

*Id.* [58 Md.App.] at 277, 473 A.2d 47.

We hold, therefore, that although ¶ 22 furnished appellees with the ability to reduce their loan commitment fee obligation from $67,000 to $14,000 plus costs and attorney's fees, if they found the loan documents to be unacceptable, they could not arbitrarily, unreasonably, and in bad faith assert unacceptability of documents merely to reduce their liability. The question, therefore, is whether the Nardos were reasonable and acting in good faith when they asserted that the terms of the loan documents were unacceptable. Since different inferences can be drawn from the facts in this case as to appellees' reasonableness and good faith, there is a genuine dispute on those material issues of fact.

**714**

The inclusion of ¶ 22 in the instant case infers at least that it was possible for the deal to break down, without fault on either side, by reason of the inability of the parties to reach agreement. Whether the parties ever reached an agreement, each was entitled to require the other to act reasonably and in good faith.

For the aforementioned reasons we are satisfied that there is a genuine dispute as to material fact and that neither party was entitled to judgment as a matter of law.

JUDGMENT REVERSED.

COSTS TO BE PAID BY APPELLEES.